[Crim. No. 4844.   In Bank.   June 15, 1948.]

THE PEOPLE, Respondent, v. HENRY WILLIAMS et al., Appellants.

Leslie C. Gillen and Joseph R. Deasy for Appellants.

Morris Lavine as Amici Curiae on behalf of Appellants.

Fred N. Howser, Attorney General, Clarence A. Linn, Deputy Attorney General, J. F. Coakley, District Attorney, Richard H. Chamberlain, Chief Assistant District Attorney, and George Nye, Deputy District Attorney, for Respondent.

SHENK, J.—The defendants were charged in Alameda County with the murder on January 19, 1947, of Arthur C. Nichols, a taxicab driver. The jury returned verdicts finding them guilty of murder of the first degree without recommendation. They appeal from the judgments imposing the death penalty and from orders denying motions for a new trial.

In December, 1946, the defendant Bowie came to California from Louisiana with Mrs. Belle Jarrett whom he had "bailed out" of jail on some charge in that state and who was married to a man in the United States Army serving overseas. They took a room together on the second floor of a rooming house on Hannah Street in Oakland. Very soon they met the defendant Williams with whom they became friendly.

Bowie and Williams were together in San Francisco on Saturday evening, January 18, 1947. To satisfy their mutual need for money they decided to "hold up" somebody. They returned to Bowie's rooming house in Oakland and Bowie obtained his .25 caliber pistol while Williams waited outside. Bowie and Williams then walked to a taxi stand and hired a Yellow Cab driven by Arthur C. Nichols, the victim. Nichols was directed to drive to a fictitious address in West Oakland. After a short ride the cab was stopped near 28th and Union Streets. Bowie, who was sitting in the back seat on the right, brandished the gun and declared it was a holdup, whereupon Williams, who was sitting to the left, reached forward and caught hold of Nichols. Nichols resisted and was struck on the head with Bowie's gun. The taxicab continued in motion. At least two shots were fired.

One bullet was imbedded in the left front door of the cab, the other entered the body of Nichols and caused his death almost immediately. The defendants fled from the scene. The uncontrolled car collided with a fire box at 30th and Union, causing the alarm to sound. The driver was found dead. The left rear door of the cab was jammed open against the side of the car.

Williams spent the rest of the night with Bowie and Mrs. Jarrett. They learned early the next morning by radio that the cab driver was dead. The defendants were arrested four days later, the gun was recovered from a bureau drawer in Bowie's room, and Mrs. Jarrett was taken into custody as a material witness.

Williams and Bowie were interrogated separately. At first Williams denied that he had been in or near the cab, claiming that he hadn't been within 8 feet of a cab for two months. He stated that he did not see Bowie at all that night, that he visited several bars in Oakland, then went home and slept until 9 o'clock Sunday morning. He changed his story when he was confronted with the fact that his fingerprints were found on the left rear door of Nichols' cab. He then said that he saw Bowie riding in the cab, that Bowie stopped the cab and that he, Williams, rode with him a few blocks, got out, and Bowie rode away. Two statements were made by Bowie which were not introduced in evidence. He made another statement after hearing in Williams' presence the reading of a statement by Williams in which the latter admitted that he told the driver to "hurry up and give me your money," but in that statement Williams sought to lay the entire blame on Bowie for the homicide. Bowie's third statement developed the facts substantially as above outlined, with the further explanation to the effect that the first bullet was discharged accidentally when he was getting out of the cab and the left rear door swung back against his right arm and knocked the gun out of his hand; that Williams who was already out of the cab picked up the gun, ran alongside and fired a shot in the direction of the driver. Bowie's testimony at the trial was substantially to the same effect. Williams testified that he was in the cab with Bowie; that he intended going to a birthday party on Adeline Street; that he didn't know Bowie had a gun; that he didn't see the gun until the time of the trial, but that he heard a shot and saw flame issuing as from a gun. It was conclusively established that the homicide occurred in

the course of an attempted robbery in which both defendants participated, an unquestionable case of first degree murder (Pen. Code, § 189). In fact guilt was and is conceded. The effort of each defendant was directed toward placing the blame on the other in order to influence a recommendation of leniency for himself. The alleged errors relied on are claimed to be prejudicial in that they adversely affected the particular defendant's chance for such a recommendation.

The first alleged error is concerned with the examination of the witness Belle Jarrett who, at the request of the prosecuting attorney, was permitted by the court to sit facing the jury but with her back toward some of the spectators in the courtroom. This appears to have been done in an effort to protect the witness from intimidation by spectators. It was represented that she had been threatened and had received a knife jab by some supposed friend of one of the defendants, stated to be Williams. It is contended that the arrangement deprived the defendants of confrontation of the witness. Defendants and their counsel moved their chairs to an oblique position from the witness. Counsel for one of the defendants accepted the offer of the prosecuting attorney to occupy the latter's chair which was almost directly in front of the witness and he cross-examined her from that position. Counsel for the other defendant also cross-examined her and made no objection to the seating arrangement. It is argued that this change in the usual arrangement affected the chances of the defendants for recommendations of leniency. Much stress is laid upon the materiality and importance of the testimony of the witness Jarrett, but the record shows that the defendants were convicted by their own admissions in prior statements and on the witness stand, and by independent evidence other than from this witness. The seating arrangement adopted should have been avoided, but it did not deprive the defendants of the rights of confrontation and a public trial. In view of the entire record, the incident should not be held to have resulted in prejudice to the defendants.

On cross-examination the defendant Bowie was asked if he had ever been convicted of a felony. He admitted that he had been convicted in Oklahoma of the offense of importing marihuana in violation of federal law, but he denied that the conviction was of a felony. The court permitted the prosecution over objection to introduce the record of conviction which showed that Bowie had served a term of 23 months in

a federal reformatory. This constituted the offense a felony under federal law (35 Stats. 1152; 18 U.S.C.A. § 541). It is claimed that in view of Bowie's admissions the record of conviction was unnecessary and that its introduction in evidence amounted to prejudicial error. The qualified admission was in effect a denial of the felony nature and character of the judgment and justified the introduction of the record in order to establish the effect of the prior conviction.

Defendant Bowie assigns as prejudicial error the ruling of the court denying his offer to introduce in evidence his statements made to officers prior to the statement introduced in evidence by the prosecution. The legal basis or right for the introduction of these prior statements containing self-serving declarations is not disclosed. The order excluding them shows no error.

Prejudice is charged because of a delayed ruling of the court in admitting in evidence the factual background of Bowie's life. Objections to the introduction of such evidence were at first sustained. Later the court reconsidered its ruling and evidence on that subject was admitted. It does not appear that any relevant testimony offered in that connection was excluded.

Prejudice is assigned because of the court's refusal at the commencement of the trial to order a daily transcript. Defendants' counsel did not object to the ruling since at first it appeared that the trial would not be prolonged. However, the trial occupied the court days between June 23d and July 7th, and the reporter's transcript consists of 1,100 pages. The request for a daily transcript was not renewed. During his closing argument the prosecuting attorney made reference to some testimony which he appeared to be reading from a transcript. At the close of that argument counsel for Bowie called attention to that fact, but also from his own recollection or notes he supplied additional matter which he deemed material on the point. There is no showing that either a partial or a full daily transcript was made to which the prosecution had access or which was denied the defendants. No error, misconduct or prejudice is shown in this regard.

The defendant Bowie charged that he was prejudiced by the taking of a short recess during the course of his counsel's argument, and that upon completion thereof on the afternoon of July 3d, the court did not require the prosecuting attorney to commence his closing argument that day, even

though it appeared that it could not be completed before the commencement of the holiday weekend. The court at first appeared to note no necessity for the usual afternoon recess, but it is reasonable to suppose that subsequently the convenience of the jury may have prompted a different conclusion. The next day, Friday, was a holiday and the case was continued to Monday, July 7th. The fact that the closing argument on behalf of the prosecution was to take place on the following Monday disclosed no undue advantage to the prosecution nor prejudice to the defendants. It was within the sound discretion of the trial court to govern the progress of the trial in conformity with the time element and no abuse of discretion is shown.

■ Defendant Bowie claims that various remarks of the trial court during the course of the trial constituted prejudicial misconduct. Fourteen occurrences are referred to. A review of the record and of each incident complained of fails to disclose any purpose to divert the course of the trial from its orderly progress. Some involved a tilt between counsel and the court about blood pressure; another was a caution to defense counsel against bantering a witness; another was a comment on the court's failure to see anything wrong in the remark of the prosecuting attorney that the examination of the deceased's widow was painful to her; another was an admonition in view of the imminent holiday to ''get down to business''; and again, ''the court is not going to continue the case for years''; another, a remark that Bowie's family and father were not on trial; two instances during Bowie's examination by his counsel were rulings on objections given in the words, ''Oh, let him answer''; another a ruling on an objection by the defense couched in the language, ''Well, it is a wee bit argumentative''; two instances of some possible levity where the court, after a short recess, asked ''May we have the stipulation that the jurors are still here?''; and when the court asked the witness Bowie if by ''Frisco'' didn't he mean ''West Oakland . . . We call it West Oakland.'' Others are of a similar nature and call for no further comment. ■ We also include for disposition in this category the contention that the prosecution was permitted unduly to emphasize the relations between Bowie and Belle Jarrett. *People* v. *Hidalgo,* 78 Cal.App.2d 926 [179 P.2d 102], is relied on by defendant Bowie. Counsel representing him obtained a reversal of the judgment of conviction in that case because

of prejudicial misconduct on the part of the district attorney. Considered singly and collectively the alleged acts of misconduct of the trial court or of the prosecuting attorney in this case present no instance comparable in seriousness to the misconduct which resulted in a reversal in the Hidalgo case.

Finally it is contended that the trial court erroneously instructed the jury on the matter of punishment to the prejudice of the defendants. The jurors were told that if, as to either defendant, they found some extenuating fact or circumstance, it was within their discretion to relieve him from the extreme penalty; but that the discretion should be employed only if they were satisfied that the lighter penalty should be imposed, and not unless some extenuating facts or circumstances were shown.

The giving of the same or a similar instruction has been assigned as error and ground for reversal in many cases, but in none has it been held to be erroneous. The earlier cases beginning with *People* v. *Jones* (1883), 63 Cal. 168, and *People* v. *Brick,* 68 Cal. 190 [8 P. 858], were reviewed and collected in *People* v. *Casade* (Oct., 1924), 194 Cal. 679 [230 P. 9], where this court said at pages 682 and 683: "It is urged that the instruction unduly and prejudicially affected the discretion to determine the penalty which said section has exclusively reposed in the jury. But by a long line of decisions in this state it has been held that the giving of said instruction is not erroneous. In the early case of *People* v. *Jones,* 63 Cal. 168, it was held that the discretion vested in the jury by said section 190 was not an arbitrary one. The instruction complained of was taken word for word from *People* v. *Brick,* 68 Cal. 190 [8 P. 858], where it was held that the giving of the instruction was not error. This instruction was again under attack in *People* v. *Olsen,* 80 Cal. 122 [22 P. 125], and the same conclusion reached. Substantially the same instruction was under review in *People* v. *Bawden,* 90 Cal. 195 [27 P. 204], and this court following the earlier decisions declined to reopen the question. In *People* v. *Rogers,* 163 Cal. 476 [126 P. 143], alleged error was predicated on the giving of this instruction, which is again set forth word for word on page 483, and the court, referring to the earlier cases, said: 'The law of the state thus appears to be thoroughly settled to the effect that the instruction in question is not erroneous.' It was likewise held not to be erroneous in *People* v. *Harris,* 169 Cal. 53 [145 P. 520], in *People* v. *Miller,* 177 Cal. 404

[170 P. 817], in *People* v. *Wolfgang,* 192 Cal. 754 [221 P. 907], and in *People* v. *Reid,* 193 Cal. 491 [225 P. 859]. Further consideration of the contention would seem to be foreclosed.'' About six months after the Casade case, in *People* v. *Bollinger* (May, 1925), 196 Cal. 205 et seq. [237 P. 25], this court criticized the continued use of such instructions; but after much discussion concluded at page 209 as follows: ''In other words, we consider as settled that the giving of such instructions is not error.'' Thus in that and subsequent cases, either with or without criticism, the instruction was held not to be error. (*People* v. *Arnold,* 199 Cal. 471, 500 [250 P. 168]; *People* v. *Smith,* 13 Cal.2d 223, 228 [88 P.2d 682]; *People* v. *King,* 13 Cal.2d 521, 525 [90 P.2d 291]; *People* v. *Smith,* 15 Cal.2d 640, 650 [104 P.2d 510]; *People* v. *Kolez,* 23 Cal.2d 670 [145 P.2d 580]; *People* v. *Lindley* (1945), 26 Cal.2d 780, 793 [161 P.2d 227].) Lack of unanimity in these views did not appear until the determination in the Kolez case in 1944 where a dissent by Mr. Justice Traynor was concurred in by Mr. Justice Schauer. But in the Lindley case in 1945 Mr. Justice Schauer concurred in the decision which ''adhered to the long line of decisions'' (p. 794) holding that the giving of such instructions was not error. Mr. Justice Traynor concurred only in the judgment. Thus, from the time that this instruction was apparently first assigned as error in the Jones case in 1883 down through the years to the Lindley case in 1945 this court has consistently and uniformly held that the instruction was not erroneous.

By this long line of cases it has been held without deviation that the discretion conferred upon the jury by section 190 of the Penal Code should not be arbitrarily exercised for or against a defendant, but should be influenced by the evidence in the case. This application of the term ''discretion'' as employed in the code section is akin to that conferred by law on a court, to be exercised not arbitrarily but to be controlled by reason and justice under the facts of the particular case. The fact that this discretion, once exercised by the jury, may not as to the penalty be disturbed on appeal is because the law has always so provided. And this was true as to the degree of the crime prior to 1927, when section 1181 of the Penal Code was amended to provide in subdivision 6 that the court on appeal should have the power to reduce the degree of the crime notwithstanding the verdict of the jury to the contrary. (*People* v. *Howard,* 211 Cal. 322, 330 [295 P. 333, 71 A.L.R. 1385].)

Aside from any question of error the condition of the evidence in this case against the defendants as the perpetrators of an unquestioned and atrocious murder is so overwhelming as to render it very unlikely that the jury would have found any other verdict even if the instruction had not been given.

The defendants were ably represented by counsel who appeared to exert every effort to protect their interests. The defendants had a full and fair trial and no ruling or incident during the trial can be said to have reacted prejudicially to their rights.

The judgments of conviction and the orders denying a new trial are affirmed.

Gibson, C. J., Edmonds, J., and Spence, J., concurred.

CARTER, J.—I dissent.

I do not agree with that portion of the majority opinion which holds that (1) there was not a denial of defendants' right of confrontation of the witness Jarrett, and (2) that what was done was not prejudicial to defendants. It is conceded that appropriate objections were made by defendants. The occurrences which constituted the denial of confrontation consist of the following stated in defendant Bowie's brief, and not challenged by respondent: ''Two prosecutors occupied the extreme left of the counsel table directly in front of the witness stand and closest to the jury. Counsel for the appellants occupied the extreme right of the counsel table farthest from the jury and the witness stand. When the witness Belle Jarrett was called by the prosecution, one of the prosecutors placed a chair at the end of the extreme left of the counsel table and facing the jury so that the witness Belle Jarrett sat facing the jury and *with her back to the appellant's counsel* and to the body of the court.

''A dispute arose between counsel and the prosecutor concerning this and it was suggested that the prosecutor's reason for this unusual procedure be confined to the court in chambers, which was done, the prosecutor explaining that the witness Belle Jarrett was fearful of being intimidated and did not wish to face either the men on trial or the spectators in the courtroom. Still over the objection of counsel for the appellant the aforementioned positions were resumed in the courtroom. The witness Belle Jarrett testified in a low monotone and the appellant's counsel in their position behind

her were left at the decided disadvantage of not being able to hear her testimony, or see or observe her facial expressions." It should be added that defendants were likewise behind the witness. It cannot be doubted that the foregoing constituted a denial of confrontation—of a "face to face" meeting of the witness, and was certainly error.

The right of confrontation is guaranteed by statute. "In a criminal action the defendant is entitled: . . . 3. To produce witnesses on his behalf and to be confronted with the witnesses against him, . . ." (Pen. Code, § 686.) And as said in *People* v. *Ward*, 105 Cal. 652, 656 [39 P. 33]: "The right of the defendant in a criminal prosecution to be confronted with the witnesses against him in the presence of the court is one of the fundamental principles of the common law, and can be taken from him only by the provisions of some express statute. As this is a right clearly connected with his personal liberty, any statute purporting to impair the right is to be liberally construed in his favor." The chief purpose of the right of confrontation is the opportunity for cross-examination but there is also the important purpose of allowing the accused to meet the witnesses "face to face." It is said: "To constitute a compliance with the constitutional right, the witnesses testifying in support of the accusation against defendant must be seen and heard by the accused. He must be permitted to be in such proximity to them that he may see them and hear their testimony. It is a violation of his rights for the court to order a defendant to take a seat so far away or in such a place that he cannot hear the testimony of a witness or see him because of intervening obstacles, or to permit the witness to turn his back toward the defendant so that his face cannot be seen." (14 Am.Jur., Crim. Law, § 181.)

In the instant case the witness Jarrett was permitted to testify with her back toward defendants and their counsel. Counsel were not able to observe her facial expressions while testifying on either direct or cross-examination. The condition was further aggravated by the explanation for permitting the foregoing, that she was afraid of attack by some cohort of one of the defendants.

Such lack of confrontation must necessarily be prejudicial. It is impossible for defendants to prove its prejudicial effect. The intangible nuances with which the confrontation is characterized are impossible for a court on appeal to grasp and in-

terpret in terms of prejudicial or nonprejudicial error. It is a fundamental right, the deprivation of which cannot be considered lightly. It is somewhat analogous to the right to a public trial, the denial of which is always prejudicial error, and in such a case it has been said: "The right to a public trial, in this respect, is comparable to the rights of trial by jury and to the assistance of counsel. They stand on the same footing. All questions as to whether these rights are essential for the protection of the substantial rights of the accused were settled affirmatively by the adoption of section 13 of article I. There can be no inquiry into the matter, so far as the right to a public trial is concerned, other than in the exceptional cases of necessity heretofore mentioned." (*People* v. *Byrnes,* 84 Cal.App.2d 72, 80 [190 P.2d 290].)

It must be assumed that our constitutional and statutory provisions were wisely framed. It cannot be denied that the provision here involved constitutes an important and effective safeguard against perjury. That the audible utterances of a witness may be fully refuted by facial expression and demeanor of the witness when confronted by those who know he is testifying falsely, has been conclusively demonstrated in many instances. There can be no doubt that the right of confrontation is of equal if not greater importance to a defendant than the right to a public trial. It is patently obvious that it is impossible to measure the effect of such an error, and if such provisions are to be given any effect whatsoever, it must be held that a denial of such a right is prejudicial.

For the foregoing reason, I would reverse the judgment and remand the cause for a new trial.

SCHAUER, J.—I dissent. I am substantially in accord with the views expressed by Justice Carter but I am impelled to comment on another proposition appearing in the majority opinion which seems to me to more clearly show prejudice and require reversal.

The substantial prejudice, in my view, arises on the trial of the issue of penalty rather than on the issue of guilt. I might agree with Justice Shenk that on the question of guilt the manifest errors may not be prejudicial but since under his opinion (concededly supported in a sense by the many precedents he cites) the substantive statutory law of this state is amended, as it is told to the jury to provide for *mandatory imposition of the death penalty* in cases of first degree murder

wherein there is no substantial showing of mitigating circumstances, whereas the statute as enacted by the Legislature (Pen. Code, § 190) and as construed by this court (*People* v. *Bollinger* (1925), 196 Cal. 191, 207 [237 P. 25]) does not make death mandatory in any case* but, rather, in all cases commits the choice of penalties, as between death and life imprisonment, solely to the discretion of the jury trying the case, it is obvious that the issues and the law as to penalty are brought into confusion and errors which may bear on penalty must be scrutinized in such light.

The statute (Pen. Code, § 190) reads, ''Every person guilty of murder in the first degree shall suffer death, or confinement in the state prison for life, at the discretion of the jury trying the same . . .'' Construing that section this court in *People* v. *Bollinger* (1925), *supra*, 196 Cal. 191, 207, said: ''We have already quoted the pertinent part of section 190 of the Penal Code. Before the amendment of that section in 1873-74 (Stats. 1873-74, p. 457) it read as follows: 'Every person guilty of murder in the first degree shall suffer death . . .' It is clear beyond question that by the language of the amended section —'Every person guilty of murder in the first degree shall suffer death, or confinement in the state prison for life, at the discretion of the jury trying the same; . . .'—two changes were made in the law as to the punishment for murder in the first degree—first, that the punishment may be *either* death or life imprisonment; and, second, that the discretion of determining which punishment shall be imposed was vested in the jury alone. For, as declared in the above† federal cases, the law places no restriction upon the jury's exercise of such discretion, nor does it attempt to confine its exercise to cases presenting palliating or mitigating circumstances . . . The legislature has 'confided the power to affix the punishment within these two alternatives to the absolute discretion of the jury. . . .' (*People* v. *Leary*, 105 Cal. 486, 496 [39 P. 24].)''

The above-quoted statute, so far as applicable and pertinent in the Bollinger case, has never been amended by the Legislature; likewise, the above-quoted holding of this court in the Bollinger case has never been overruled; on the contrary it has been reiterated. The majority opinion here does not declare that it is overruled. What then is the law? What

---

*We are not discussing section 4500 of the Penal Code.

†*Winston* v. *United States*, *Strather* v. *United States*, and *Smith* v. *United States* (1898), 172 U.S. 303 [19 S.Ct. 212, 43 L.Ed. 456].

instruction should trial courts give on the subject? Are we, the court of last resort in this state, to continue to tolerate the putting to death of defendants on the unauthorized direction to juries that death is mandatory unless mitigating circumstances be shown? Or would it be error to instruct juries that the law does not fix the penalty in any first degree murder case but in all such cases leaves entirely to the absolute and uncontrolled discretion of the jury, regardless of a total absence of mitigating circumstances, the selection of either of two penalties, death or life imprisonment? Is this court to continue to denounce prosecutors and trial judges (see *People v. Smith* (1939), 13 Cal.2d 223, 229 [88 P.2d 682]) for asking and giving an instruction, ''where a human life is at stake,'' which ''interfere[s] with the discharge of that solemn duty by the jury'' while at the same time rationalizing its own failure to reverse judgments based on such instruction by the flat assertion that ''it is not error''? The whole subject, I think, should be reexamined, not only because we have simultaneously extant two irreconcilably conflicting lines of opinion pronouncements with attending confusion, but because also the one line of pronouncement derives from a case (*People v. Welch* (1874), 49 Cal. 174) which, whatever may have been its value once, is no longer sound law, the United States Supreme Court in the very recent case (April, 1948) of *Andres v. United States,* 333 U.S. 740 [68 S.Ct. 880, 92 L.Ed. ——], having removed such modicum of respectability as authority which may have persisted in the Welch case after its earlier sapping in *Winston* v. *United States* (1898), 172 U.S. 303 [19 S.Ct. 212, 43 L.Ed. 456, 459].

It must be manifest that we have here not a mere procedural error or error in instructions to juries as such errors are commonly understood. The instruction involved here did not merely concern procedural rules governing the jury in their deliberations; it altered the substantive statutory law of the state prescribing the penalty in first degree murder cases. The jury were told: ''If the jury in this case should find either defendant guilty of murder in the first degree, and they also shall find the further fact that there are some extenuating circumstances or facts in the case as to that defendant, it is within their discretion to pronounce such a sentence as will relieve the defendant from the extreme penalty of the law. The Penal Code invests a jury in a criminal case of murder with the discretion, limited to determining

which of two punishments shall be inflicted, *and that discretion is to be employed only when the jury is satisfied that the lighter penalty should be imposed. If the evidence shows beyond all reasonable doubt either of the defendants to be guilty of murder in the first degree, but does not show some extenuating facts or circumstances, it is the duty of the jury to find a simple verdict of murder in the first degree as to such defendant, and leave with the law the responsibility of fixing the punishment."* (Italics added.)

Counsel for appellant Bowie, in his commendably frank and helpful brief, says, ''Though a man be guilty of a heinous offense, there is no exception to the doctrine that respect for the law cannot be inspired by withholding the protection of the law, and no higher duty, no more solemn responsibility, rests upon the courts than to maintain the constitutional and statutory shields planned and inscribed to preserve liberty under law and protect each individual from oppression and wrong, from whatever source it may emanate.'' I am in full accord with counsel; the opinion of the majority, in my view, cannot be squared with the quoted statement. Let us look realistically at the majority holding and its basis.

The majority opinion refers to the quoted instruction and says, ''The giving of the same or a similar instruction has been assigned as error and ground for reversal in many cases, but in none has it been held to be erroneous.'' The opinion then discusses cases ''beginning with *People* v. *Jones* (1883), 63 Cal. 168, and *People* v. *Brick,* 68 Cal. 190 [8 P. 858]'' and running down to *People* v. *Kolez* (1944), 23 Cal.2d 670 [145 P.2d 580], and *People* v. *Lindley* (1945), 26 Cal.2d 780 [161 P.2d 227], and says, ''By this long line of cases it has been held without deviation that the discretion conferred upon the jury by section 190 of the Penal Code should not be arbitrarily exercised for or against a defendant, but should be influenced by the evidence in the case. This application of the term 'discretion' as employed in the code section is akin to that conferred by law on a court, to be exercised not arbitrarily but to be controlled by reason and justice under the facts of the particular case.'' But in that ''long line . . . without deviation,'' is the Bollinger case (and see also the cases it cites) wherein this court said that ''It is clear beyond question . . . that the punishment may be *either* death or life imprisonment; and . . . that the discretion of determining which punishment shall be imposed was [by the 1874 amendment]

vested in the jury alone. . . . [T]he law places no restriction upon the jury's exercise of such discretion, nor does it attempt to confine its exercise to cases presenting palliating or mitigating circumstances . . .''

As early as 1898, the United States Supreme Court declared its views upon the effect of a liberalizing amendment to the federal law. In *Winston* v. *United States* (1898), 172 U.S. 303 [19 S.Ct. 212, 43 L.Ed. 456], the court said: ''These were three cases of indictments . . . for murders committed since the passage of the act of . . . January 15, 1897, chap. 29, by the first section of which, 'in all cases where the accused is found guilty of the crime of murder . . . the jury may qualify their verdict by adding thereto ''without capital punishment;'' and whenever the jury shall return a verdict qualified as aforesaid the person convicted shall be sentenced to imprisonment . . . for life.' 29 Stat. at L. 487 . . .

''[p. 457 of 43 L.Ed.] The judge instructed the jury . . . 'That qualification cannot be added unless it be the unanimous conclusion of the twelve men constituting the jury. I think that it should not be added unless it be in cases that commend themselves to the good judgment of the jury, cases that have palliating circumstances which would seem to justify and require it.' . . .

''[p. 459 of 43 L.Ed., reversing the trial court] The right to qualify a verdict of guilty, by [p. 460 of L.Ed.] adding the words 'without capital punishment,' is thus conferred upon the jury in all cases of murder. The act does not itself prescribe, nor authorize the court to prescribe, any rule defining or circumscribing the exercise of this right; but commits the whole matter of its exercise to the judgment and the consciences of the jury. The authority of the jury to decide that the accused shall not be punished capitally is not limited to cases in which the court, or the jury, is of opinion that there are palliating or mitigating circumstances. But it extends to every case in which, upon a view of the whole evidence, the jury is of opinion that it would not be just or wise to impose capital punishment. How far considerations of age, sex, ignorance, illness, or intoxication, of human passion or weakness, of sympathy or clemency, or the irrevocableness of an executed sentence of death, or an apprehension that explanatory facts may exist which have not been brought to light, or any other consideration whatever, should be allowed weight in deciding the question whether the accused should or

should not be capitally punished, is committed by the act of Congress to the sound discretion of the jury, and of the jury alone.''

In the recent case of *Andres* v. *United States* (1948), *supra,* 333 U.S. 740 [68 S.Ct. 880, 92 L.Ed. ——], the United States Supreme Court considered again the same statute as was involved in the Winston case. A conviction bearing the death penalty was reversed because the trial court had not clearly instructed that the jury must be unanimous upon the issue of penalty as well as upon that of guilt. The court said: '' [p. 883 of 68 S.Ct.] If a qualified verdict is not returned, the death penalty is mandatory. The Government argues that § 567 properly construed requires that the jury first unanimously decide the guilt of the accused and, then, with the same unanimity decide whether a qualified verdict shall be returned. As the statute requires the death penalty on a verdict of guilty, the contention is that the jury acts unanimously in finding guilt and the law exacts the penalty. It follows, that if all twelve of the jurors cannot agree to add the words 'without capital punishment,' the original verdict of guilt stands and the punishment of death must be imposed. The petitioner contends that § 567 must be construed to require unanimity in respect to both guilt and punishment before a verdict can be returned. It follows that one juror can prevent a verdict which requires the death penalty, although there is unanimity in finding the accused guilty of murder in the first degree. . . . [p. 884] Unanimity in jury verdicts is required where the Sixth and Seventh Amendments apply. In criminal cases this requirement of unanimity extends to all issues—character or degree of the crime, guilt and punishment—which are left to the jury. A verdict embodies in a single finding the conclusions by the jury upon all the questions submitted to it. We do not think that the grant of authority to the jury by § 567 to qualify their verdict permits a procedure whereby a unanimous jury must first find guilt and then a unanimous jury alleviate its rigor. . . . This construction is more consonant with the general humanitarian purpose of the statute and the history of the Anglo-American jury system than that presented by the Government. . . . [p. 885] It seems to us, . . . that where a jury is told first that their verdict must be unanimous, and later, in response to a question directed to the particular problem of qualified verdicts, that if their verdict is first-degree murder and they

desire to qualify it, they must be unanimous in so doing, the jury might reasonably conclude that, if they cannot all agree to grant mercy, the verdict of guilt must stand unqualified. That reasonable men might derive a meaning from the instructions given other than the proper meaning of § 567 is probable. In death cases doubts such as those presented here should be resolved in favor of the accused.''

The substantive law of California enacted by the Legislature, as above shown, provides that the penalty for murder of the first degree shall be ''death, or confinement in the state prison for life, at the discretion of the jury'' trying the case; the substantive law as ''construed'' by the majority opinion is that the penalty for murder of the first degree *shall be death* ''unless some extenuating facts or circumstances'' are shown, in which event, *but only in which event,* the jury may reduce the penalty to life imprisonment. Manifestly, such judicial ''construction'' of a statute, the language of which the same court admits is ''clear beyond question'' to the contrary, all to the end of sustaining death sentences in cases not authorized either by the letter or the spirit of our statute, is also directly contrary to the policy declared by the United States Supreme Court in the Andres case, as above quoted.

The majority opinion here, like that in *People* v. *Kolez* (1944), *supra,* 23 Cal.2d 670, and other cases subsequent to Bollinger and cited by the majority, does not squarely overrule the Bollinger holding in any respect; it does not squarely declare that it would be error against the state to instruct the jury in accord with the language of the statute or to refuse to give the instruction which here was given. As said by Justice Traynor, in his dissent to Kolez (p. 674 of 23 Cal.2d), ''For over fifty years precedents have accumulated condemning such instructions, even though the court has fallen short of reversing judgments because of them.'' Likewise as pointed out by Justice Traynor in the same dissent, this court has repeatedly chided prosecuting attorneys for requesting and trial courts for giving the instruction in question. In *People* v. *Smith* (1939), 13 Cal.2d 223, 229 [88 P.2d 682], the court quoted from the Bollinger case the statement ''And considering the numerous occasions this court has held that section 190 . . . confers on the jury alone the discretion of determining the punishment in cases of guilt of murder in the first degree, trial courts, especially where a human life is at stake,

should not interfere with the discharge of that solemn duty by the jury." The Smith case opinion then proceeds: "Just why this and similar warnings by this court have not been observed by prosecuting officers and trial courts, we are at a loss to understand." It seems to me that the explanation of that which the court then was "at a loss to understand" has become all too clear: The denounced practice has been continued *because this court has tolerated it and the evil instruction will continue in use until this court finally enforces what it has so often recognized to be the law.*

Obviously, the inconsistencies above disclosed leave the law in confusion. Why are they not cleared away? What is the answer of the majority to the questions suggested? To make the bald assertion that "it is not error" to instruct a jury that the death penalty is mandatory under some circumstances which well may be found, when the statute makes it "clear beyond question" that such penalty is only discretionary in every case, is pure legalism to which no amount of repetition can add moral verity.

The majority opinion fails to give the full history of the genesis of the error which it propagates; it goes back only as far as the Jones case (1883), 63 Cal. 168, and the Brick case (1885), 68 Cal. 190 [8 P. 858]. Actually, the "error" has earlier origin; in *People* v. *Welch* (1874), 49 Cal. 174, its basis was laid. That case arose shortly after enactment of the previously noted 1874 amendment to section 190 of the Penal Code. Prior to that amendment the sole punishment for murder of the first degree was death; the amendment created the changes discussed in the Bollinger case; i. e., it provided that the punishment may be *either* death or life imprisonment and that the responsibility of determining which punishment shall be imposed was vested in the jury's "absolute discretion." But in the Welch case the jury returned a verdict reading, "We, the jurors, do find the defendant Welch guilty of murder in the first degree, as charged in the indictment." The verdict was absolutely silent as to the penalty to be imposed and the jury had not been instructed that a verdict in the form quoted would mean the death penalty. (The 1874 amendment, although it had been enacted, may not have been in effect at the time of trial; it was certainly in effect when the case was determined on appeal.) The question which the court actually considered and determined was whether the jury had to determine the penalty at all.

Upon the facts above epitomized the court held (p. 178 of 49 Cal.) : ''Section 190 of the Penal Code, as amended by the Act of March 28, 1874, reads: 'Every person guilty of murder in the first degree shall suffer death, or confinement in the State Prison for life, at the discretion of the jury trying the same . . .' [p. 179] The nature of that discretion is to be ascertained by reference to the language of the statute. In Virginia it was held, that in an action *qui tam* the verdict should fix the amount of damages. (Scott's case, 5 Grat. 6,797.) Also, that where the duty was imposed on the jury of fixing the term of imprisonment, and the verdict did not ascertain such term, it should be set aside. (Mills' case, 7 Leigh, 751.)

''But the Act amending Section 190 of the Penal Code does not give the general discretion which juries exercised under the Virginia statute. Here their discretion is limited, at most, to determining which of two punishments shall be inflicted; and we think that it is still more restricted, and is to be employed only where the jury is satisfied that the lighter penalty should be imposed. It would seem that, in view of the apparently growing disinclination to find verdicts of murder in the first degree, when the necessary result is capital punishment, and the existence of a feeling that there were nicer distinctions in the degree of malignancy exhibited in murders than were made by the letter of the statute definitions, the Legislature intended to give to the jury, when the verdict was murder of the first degree, the power of relieving the defendant of the extreme penalty, and of substituting another punishment in its stead. A verdict fixing the punishment at imprisonment for life is somewhat analogous to the French verdict, 'Guilty with extenuating circumstances,' and is the equivalent of the Louisiana verdict, 'Guilty without capital punishment,' held good in *State* v. *Rohfrischt* (12 La.An. 382) ; and authorized by the statute which provides, 'In all cases where the punishment denounced by law is death, it shall be lawful for the jury to qualify their verdict by adding thereto, ''without capital punishment.'' And whenever the jury shall return a verdict qualified as aforesaid, the person convicted shall be sentenced to hard labor for life in the State Penitentiary.' (Rev.Stat. of La. p. 163.)

''This view of the question is not unsustained by authority in California. By the Act of April 22, 1851, it was enacted:

'Every person who shall feloniously steal, etc., shall be deemed guilty of grand larceny, and upon conviction thereof, shall be punished by imprisonment in the State prison for any term, not less than one year nor more than ten years, or by death, in the discretion of the jury.' And in *The People* v. *Little-field* (5 Cal. 355), this Court said: 'It would seem, from the language of the Act, that it was the intention of the Legislature that the jury should only assess the punishment when, in the exercise of their discretion, they thought that the defendant deserved the punishment of death. If they did not agree to such punishment, upon finding the defendant guilty, then they should find a general verdict.' In that case, it was evidently considered that the object of the Legislature (actuated by the circumstance that certain kinds of property—as live stock—were peculiarly exposed, in portions of this State, or by some other motive equally just) was to confer upon the juries the power of affixing, at their discretion, a more severe penalty than had previously been imposed on those guilty of grand larceny. By parity of reasoning we may say, in view of the former punishment for the crime of murder of the first degree, and the history of legislation on the subject in this State and elsewhere, that it was the purpose of the Legislature (by the amendment of section 190) to permit the jury, in a case where the facts proved brought the crime of the defendant within the statutory definition of the higher offense, but they believed the punishment of death too severe, to declare that he should be imprisoned for life. We think, therefore, the statute should be construed as if it read: 'Shall suffer death, or (in the discretion of the jury) imprisonment in the State prison for life.' . . . [p. 185, on denial of petition for rehearing] It results from the construction we have given to Section 190 of the Penal Code (as amended) that a jury may—in the exercise of its discretion—declare that a defendant guilty of murder of the first degree shall be punished by confinement in the State prison for life. If a jury shall agree that a defendant is guilty of murder of the first degree, but cannot agree that the punishment shall be imprisonment for life, or shall not declare that the punishment shall be such imprisonment, it will be the duty of the Court to pronounce judgment of death. The jury need not declare that death shall be inflicted—in cases where they cannot agree on imprisonment—since, if the verdict is silent in respect to the penalty, the Court must sentence the defendant to death.''

In my view no part of the Welch opinion above quoted is sound law; to me neither age nor repetition has hallowed the speciousness of the reasoning above quoted. There is nothing in the statute which authorizes holding that the jurors are not required to agree on the penalty just as they must agree on the guilt; neither is there aught in the statute which makes death mandatory unless evidence of mitigating circumstances is produced and the jury so recommend. The responsibility for making the selection of punishments is placed squarely on the jury by the Legislature and the courts should leave it there. But in *People* v. *Brick* (1885), 68 Cal. 190 [8 P. 858], an instruction was given which is almost verbatim (and in substance identical with) that which was given here and quoted above. Relying upon the Welch case the court said (p. 192): "There is in this instruction no error. The discretion given the jury by the statute is not an arbitrary one, but is to be employed, as said by this court in *People* v. *Welch,* 49 Cal. 179, 'only where the jury is satisfied that the lighter penalty should be imposed.' Of course, the jury could only be satisfied by the facts and circumstances of the case." From the union of the errors of Welch and Brick* has come, and still persists, that grievous error which still plagues us. Our continued tolerance of it, particularly in view of the holding of the United States Supreme Court in the Andres case, *supra* (333 U.S. 740), is even more indefensible than was its genesis.

To Abraham Lincoln is ascribed the declaration, "I shall try to correct errors where shown to be errors; and I shall adopt new views as fast as they shall appear to be true views." That principle seems to me to be a good one, not alone for the chief executive of a great nation but also for a justice of a court of last resort. I think it has been shown that we have erred; at the very least that we *shall* err if we persist, after Andres, in adhering to the holdings of Welch and Brick; I think the true view is that which in Bollinger we said was "clear beyond question" and that it is our duty to enforce the true view.

As is pointed out in the majority opinion this court cannot reduce the penalty without disturbing the judgment of con-

---

*People* v. *Jones* (1883), 63 Cal. 168, is also a contributor, an apparently somewhat similar instruction having been there approved, but since the exact language of the instruction is not set forth it is not charged with full culpability.

viction; under the holding of the majority the jury in fixing the penalty are bound to exercise legal discretion; i. e., they must exercise their discretion only upon evidence. Certainly it should follow that they must receive and consider all evidence pertinent to that issue. It is apparent, therefore, that errors which prejudicially affect the defendant insofar as the *trial as to penalty* is concerned must result in a reversal of the judgment. Here the cumulative effect of the many errors which strike directly at the issue of penalty is so substantial that I cannot but conclude that the defendants have been prejudiced.

Hence, even though the majority persist in perpetuating the 1874 rule for mandatory death penalty in the absence of mitigating evidence, such ruling here does not justify affirmance. Rather, does that ruling, and the instruction given, aggravate to prejudicial moment the other errors noted.

The judgment should be reversed and a new trial had.

Carter, J., and Traynor, J., concurred.

Appellants' petition for a rehearing was denied July 8, 1948. Carter, J., Traynor, J., and Schauer, J., voted for a rehearing, and the following opinions were then filed:

CARTER, J., dissenting.—Since the filing of the majority and dissenting opinions in this cause letters have been received from the District Attorney of Alameda County and from counsel for defendant Williams calling attention to certain discrepancies in the majority opinion and in the dissenting opinion prepared by me relative to the seating arrangement of the witness Belle Jarrett and the various attorneys in the courtroom during the trial. Attached to the correspondence of the district attorney is a diagram showing the seating arrangement of the various participants in the trial. The accuracy of this diagram is questioned in some minor respects by counsel for defendant Williams, but I accept the diagram as being substantially correct. The district attorney concedes in his letter that "it is difficult, if not impossible, to glean from the Reporter's Transcript the exact relative positions of the witness and the various attorneys." For this reason, I accepted as correct and accurate the statement contained in defendant Bowie's brief, which statement was not challenged by respondent, and quoted the same verbatim in my dissenting opinion.

From the diagram now presented by the district attorney it appears that the two prosecuting attorneys were seated at the left half of the counsel table directly in front of the jury, and counsel for defense were seated at the right half of the counsel table alongside of the prosecuting attorneys, and the defendants were seated directly to the rear of their respective counsel. The witness Belle Jarrett was seated to the left rear of the prosecuting attorneys and to the extreme left of one facing the jury box. It therefore appears from this diagram that in order for counsel for defendants to see the witness it was necessary for them to turn around in their respective chairs and look in the opposite direction from the counsel table. In so doing they could see only the right side of the witness' face. Likewise, the defendants by turning to their left could see the right side of the witness' face. Mention is made in the correspondence of the district attorney that counsel for defendant Bowie was offered and accepted a seat at the left end of the counsel table during the cross-examination of the witness. This would place him in a position about 7 feet from and directly in front of the witness.

While the situation disclosed by the diagram submitted by the district attorney with respect to the seating arrangement in the courtroom is somewhat different than that depicted in the quotation from appellant Bowie's brief contained in my dissenting opinion, I am still of the view that defendants were denied the right of confrontation as provided by section 686 of the Penal Code and that the reasoning and authorities contained in my dissenting opinion are applicable to the seating arrangement in the courtroom as disclosed by the diagram submitted by the district attorney. For this reason I am not disposed to depart from the conclusion there announced.

SCHAUER, J.—I dissent from the order denying a rehearing. In addition to what is said in my dissent from the main opinion I wish to emphasize that the effect of the majority opinion is to deprive each defendant of his life without due process of law and in the taking of his life to deny to him the equal protection of the law.

It is concededly the law of California that in first degree murder cases the penalty is not mandatorily death but is, in the alternative, either life imprisonment or death, in the sole discretion of the jury trying the case. (Pen. Code, § 190;

*People* v. *Bollinger* (1925), 196 Cal. 191, 207 [237 P. 25];
*People* v. *Martin* (1938), 12 Cal.2d 466, 471 [85 P.2d 880];
*People* v. *Smith* (1939), 13 Cal.2d 223, 229 [88 P.2d 682].)
The state Constitution (art. I, §§ 7, 13) and the statutes
(Pen. Code, §§ 190, 1042, 1157) give to a defendant charged
with murder the right, where he does not waive a jury trial,
to have the jury determine not only the question of his guilt
or innocence and the question of the class and degree of the
offense, but also, if the offense be murder of the first degree,
the penalty to be imposed. The law does not give any pref-
erence to either penalty but leaves such selection solely to
the jury, and it requires that the jury be unanimous in its
determination of the penalty as it must be unanimous on the
questions of guilt and class or degree of the crime. (*People*
v. *Lee Gow* (1918), 38 Cal.App. 248, 250 [175 P. 917]; *People*
v. *Garcia* (1929), 98 Cal.App. 702, 704 [277 P. 747]; *People*
v. *Richardson* (1934), 138 Cal.App. 404 [32 P.2d 433].)

Pertinent in this connection is the following discussion
by this court (speaking through Mr. Justice Shenk) in *People*
v. *Hall* (1926), 199 Cal. 451, 456-458 [249 P. 859] (although
this court there approved, by way of dictum, the practice of
permitting a jury to evade express recognition of its respon-
sibility by instructing them that the death sentence would
be imposed, and by imposing such sentence, when the verdict
was silent upon the subject of penalty): ''From a consid-
eration of our decisions it appears to be the settled law of
this state that in the trial on a charge of murder it is first
incumbent upon the jury to determine the guilt or innocence
of the accused. If he be found guilty of murder in the first
degree it is then incumbent on the jury to fix the penalty.
. . . Under the law the verdict in such a case must be the
result of the unanimous agreement of the jurors and the
verdict is incomplete unless, as returned, it embraces the two
necessary constituent elements; first, a finding that the
accused is guilty of murder in the first degree, and, secondly,
legal evidence that the jury has fixed the penalty in the
exercise of its discretion. . . . It was the duty of the jury to
exercise its discretion and fix the penalty. Failing to do
so no penalty was determined upon. The jury could not
exercise its discretion and not exercise it in one and the
same verdict. When a verdict, such as the one here under
consideration [such verdict was, ''We, the jury . . ., find the
defendant . . . guilty of the crime of murder as charged in

the indictment, of the first degree. But cannot come to an unanimous agreement as to degree of punishment''], discloses on its face that such discretion was not exercised as to either penalty it is not a verdict upon which the court is authorized to pronounce judgment of either death or life imprisonment. In receiving such a verdict and in imposing the sentence of death upon the defendant, the court usurped the function of the jury and its judgment was a nullity. The proceeding therefore resulted in a mistrial and the judgment must be reversed. . . . We cannot agree that the defect in the verdict was merely an error in 'matter of procedure' as contemplated by . . . section 4½ [of art. VI of the state Const.]. On the contrary the defect involved matter of substantial and substantive right. It was in effect the denial of a trial by jury. The amendment by which said section 4½ was added to the constitution was not 'designed to repeal or abrogate the guarantees accorded persons accused of crime by other parts of the same constitution, or to overthrow all statutory rules of procedure and evidence in criminal cases' [citations]. Trial by jury is guaranteed to every person charged with a felony and the denial of that right is in itself a miscarriage of justice. . . . [H]owever degraded and hardened a criminal the evidence may disclose an accused to be, he is entitled under the constitution to trial by jury. In legal effect this right was denied to the defendant in the case at bar. The proceedings before the trial court [which imposed the death sentence] amounted to the same as if the court had denied the defendant a trial by jury in the first instance and, having heard the evidence and found the defendant guilty, proceeded to impose the judgment of death. Such a judgment may not stand even though there be the clearest proof of guilt.''

There is no question of the power of the Legislature to provide that a defendant shall have the right to have his punishment determined by a jury in its sole discretion. But, under the holding of the majority of this court, the right is meaningless and unenforceable and can be stripped away at the whim of a trial court; a trial court can, if it so desires, arbitrarily deprive a defendant of the right to jury trial on the particular issue by informing the jury that, contrary to the legislative provision, their discretion as to choice of penalty ''is to be employed only when the jury is satisfied that the lighter penalty should be imposed. If the evidence . . .

does not show some extenuating facts or circumstances, it is the duty of the jury to find a simple verdict of murder in the first degree as to such defendant, and leave with the law the responsibility of fixing the punishment.'' According to this instruction the jury has no responsibility for imposing the extreme penalty. If it is not satisfied *from evidence of extenuating or mitigating circumstances* that the lighter penalty should be imposed, *it need make no determination as to punishment; it can simply arrive at a verdict of guilty, remain silent as to penalty, and leave responsibility with "the law"—the law as declared by this court, not by the Legislature.* These defendants go to their deaths without the return of any verdict of the jury unanimously, as the act of each of the 12 jurors, selecting death as the punishment to be inflicted. The penalty to be imposed upon them has been fixed, not in the manner or upon the responsibility prescribed by the Legislature, but by court-made ''law'' which contravenes the express provision of the Legislature.

Trial courts may instruct juries in accord with section 190 of the Penal Code (I assume that this court would not hold it error for a trial court thus to obey the legislative mandate) or they may instruct them in accord with the law as this court has declared it. Upon what whimsy shall the fatal selection of paradoxically conflicting instructions be made? Death sentences may be imposed after verdicts fixing such penalty or they may be imposed after verdicts which fix no penalty. The choice of procedure may be governed by any reason or no reason, but always by whim or caprice. It must always be by whim or caprice because there is no law enacted by the Legislature, and none has been judicially declared by this court, by which the choice of the mandatory law-imposed death penalty instruction or the discretionary life imprisonment instruction shall be selected.

In my view the processes of law are not duly administered, and equal protection of the law is not given to all within the class of persons found guilty of first degree murder, when some are sentenced to death only upon the unanimous and express decision of a jury and others are sentenced to death because of the silence of a jury and the leaving of the penalty ''to the law''—''the law'' as capriciously declared in the particular case by the trial court with the assured approval of this court.

Carter, J., and Traynor, J., concurred.