[Crim. No. 1393. In Bank.—November 29, 1907.]

THE PEOPLE, Respondent, v. W. H. RYAN, Appellant.

CRIMINAL LAW—MURDER IN SECOND DEGREE—DELIBERATION AND PRE-MEDITATION — INSTRUCTION. — A verdict of murder in the second degree necessarily implies a finding by the jury that the killing was without deliberation and premeditation, and hence an erroneous instruction on these subjects would be harmless if it was declared to be applicable only to murder of the first degree.

ID.—DEFENDANT AS WITNESS—INSTRUCTION AS TO EVIDENCE.—Where the defendant in a criminal case tried before the rendition of the opinion in *People* v. *Maughs*, 149 Cal. 253, becomes a witness in his own behalf, an instruction that he had such right and that the jury should consider his testimony as they would that of any other witness, but that is was "proper for the jury to bear in mind the situation of the defendant, the manner in which he may be affected by the verdict, and the very grave interest he must feel in it, . . . and to consider whether this position and interest may not affect his credibility or color his testimony," will not be construed as

evidence of a desire on the part of the trial judge to be unfair to the defendant. The intimation given by the supreme court in the case of *People* v. *Maughs,* that it would consider the giving of such an instruction thereafter to be evidence of unfairness on the part of the trial court prejudicial to the defendant, was not intended to have a retroactive effect.

ID.—JURORS—VOIR DIRE—CONTRADICTORY ANSWERS AS TO QUESTIONS TOUCHING OPINION.—Where a juror on his *voir dire* gives contradictory answers to questions put to him touching his ability to set aside his opinion as to the defendant's guilt, it is the duty of the trial court to decide which of the answers most truly shows the juror's mind, and its decision is binding on appeal. The trial court should be liberal in giving the defendant and the people the benefit of any doubts that may arise as to the fairness of the juror and his ability to lay aside preconceived impressions and should excuse the juror if such doubt is created.

ID.—EVIDENCE OF JEALOUSY—IMMATERIAL ERROR.—In a prosecution for murder, where in the evidence offered by the defense there was no substantial proof that at the time of the killing the deceased had any feeling of jealousy towards the defendant on account of the latter's relations with the wife of the deceased, and no proof at all that the defendant then supposed that the deceased was moved by jealous rage, the admission in rebuttal of the evidence of the wife of the deceased to the effect that, so far as she knew, the deceased never had or pretended to have any jealousy of the defendant, was a mere technical error and was without prejudice.

ID.—REFUSAL TO ALLOW RECALL OF WITNESS — TESTIMONY ALREADY GIVEN.—There was no error in refusing to allow a witness for the defense to be recalled, after the close of the evidence in rebuttal, to further explain parts of his testimony at the preliminary examination, which had been introduced in rebuttal, if in his previous examination he had admitted the giving of the testimony on the former occasion substantially as proven, and had been given ample opportunity to explain and had explained in his own way certain unimportant and trivial discrepancies that had been disclosed.

ID.—IMPEACHMENT — HOSTILITY OF WITNESS — EVIDENCE OF HOSTILE STATEMENT.—It is competent, for purposes of impeachment, on the cross-examination of a witness for the defendant, to question him concerning a remark imputed to him which tended to show the ill-will of the witness towards the deceased, and in rebuttal to prove that he made the statement as imputed to him in the question.

APPEAL from a judgment of the Superior Court of Plumas County, and from an order refusing a new trial. J. D. Goodwin, Judge.

The facts are stated in the opinion of the court.

Grove L. Johnson, and W. W. Kellogg, for Appellant.

U. S. Webb, Attorney-General, and J. Charles Jones, Assistant Attorney-General, for Respondent.

SHAW, J.—The defendant was charged with the murder of one Fred Scott. He was convicted of murder of the second degree, and appeals from the judgment of conviction and from an order denying his motion for a new trial.

The homicide occurred on April 19, 1905. At that time the defendant, with two other persons, Potts and Ketchum by name, were in possession of and were working, or developing, a mine belonging to Scott, under a lease which expired May 1, 1905. Scott had informed them that they must quit possession of the premises at the expiration of the lease. There was evidence that Ryan was very angry at this and that on account thereof he had made threats that he would kill Scott if an extension of the lease were not granted. The homicide occurred in a bunk-house on the premises, which was used by the three lessees as a residence. There were present at the time the three lessees, the deceased Fred Scott and his son Willis. There was some angry talk between Scott and Potts, and Scott said they would all have to get out on the first of the month. Ryan was sitting on a stool and had said nothing, when Scott walked over to him, took him by the hair with the left hand and gave his hair a jerk, at the same time putting his right hand in the right hand front pocket of his trousers, and applying to Ryan a vulgar epithet. Thereupon Ryan took from the floor a piece of pick handle two feet long, which had been in use as a poker, and attacked Scott with it, striking him on the head with it seven times and forcing or crowding him reeling backward some ten feet to one of the bunks, where he struck the last blow and Scott fell on the bunk. Soon afterward he got up and with the assistance of his son walked to his own residence one hundred and fifty feet away. At five o'clock that afternoon he died from the effects of the blows. On that morning Scott had said to Ryan: "You —— —— —— you won't see the sun go down." About the first of April, Ryan had mentioned to Scott that he, Ryan, was going to Greenville, and Scott had said, "If you go there and I find out you spoke to my wife, I will cut your guts out." Ryan testified that from that

remark he thought Scott was jealous of him, but that he had changed his mind a little in that respect, and that he saw no reason he had to be jealous. The only excuse he gave for the homicide, in his testimony, was that he knew Scott possessed a dirk knife and that he expected him to have it in the front pocket of his overalls in which he put his hand; that he was afraid of Scott and struck in order to disable him, and as the first blow did not seem to disable him, he struck the other blows as fast as he could for the same purpose, and to prevent Scott from getting away, and that he struck to save his own life. It appears from Ryan's testimony that he, himself, believed that he was a much stronger man than Scott, or, as he expressed it, that he could lift a bigger rock than Scott could roll over. It was admitted that Ryan's blows on that occasion caused Scott's death. So far we have stated the facts as they appear from the uncontradicted evidence for the prosecution and from the evidence for the defense, including that of the defendant himself. There was other evidence for the prosecution to the effect that when Ryan struck the first blow Scott backed toward the bunk, facing Ryan; that Ryan followed, striking Scott repeatedly on the head with the pick handle, Scott putting his arm before his face attempting to guard the blows, but making no attempt to strike Ryan; that just before he got to the bunk Scott turned around with his face away from Ryan and toward the bunk and fell, face downward, on the bunk, and that Ryan struck Scott two or three blows while he was in that position. It was also shown, and not disputed, that Scott's skull was fractured just above the left ear; that there was a cut three inches long in the flesh at that place, two others of the same length on the back of the head, extending to the bone, another on the right hand side of the forehead and one back of the ear, besides other bruises of less severity. Ryan did not deny that he had made the several threats to kill Scott, as testified to by witnesses for the prosecution.

It will be seen from this statement of the case that the only material questions about which there could be any serious controversy were whether or not the defendant was really acting in self-defense in the infliction of the blows upon Scott, and, if not, whether the homicide was murder of the first degree, murder of the second degree, or manslaughter.

Some criticism is made of an instruction relating to the space of time between the formation of the intent to kill and the act of killing necessary to constitute murder of the first degree, and to the proposition that murder of that degree must be the result of premeditation. It is not necessary to discuss this instruction. The verdict of murder of the second degree necessarily implies a finding by the jury that the killing was without deliberation and premeditation, and, hence, even an erroneous instruction on these subjects would be harmless, if it was declared to be applicable only to murder of the first degree, as was the case with the instruction referred to. We do not mean to intimate, however, that the instructions on these points, when considered in connection with each other, as they must be, are erroneous.

The court instructed the jury as follows:

"The defendant has been examined as a witness upon his own behalf. This is his right and the jury will consider his testimony as they will that of any other witness examined before them. It is proper, however, for the jury to bear in mind the situation of the defendant, the manner in which he may be affected by the verdict, and the very grave interest he must feel in it; and it is proper for the jury to consider whether this position and interest may not affect his credibility or color his testimony."

This is, in some respects, similar to the instruction first approved in *People v. Cronin,* 34 Cal. 204, and afterwards held sound, or at least not prejudicial error, in the following cases: (*People v. Morrow,* 60 Cal. 147; *People v. Nichols,* 62 Cal. 522; *People v. O'Neal,* 67 Cal. 379, [7 Pac. 790]; *People v. Murray,* 86 Cal. 35, [24 Pac. 802]; *People v. O'Brien,* 96 Cal. 182, [31 Pac. 45]; *People v. Faulke,* 96 Cal. 20, [30 Pac. 837]; *People v. Fehrenback,* 102 Cal. 402, [36 Pac. 678]; *People v. Curry,* 103 Cal. 549, [37 Pac. 503]; *People v. Hitchcock,* 104 Cal. 486, [38 Pac. 198]; *People v. Anderson,* 105 Cal. 35, [38 Pac. 513]; *People v. Van Ewen,* 111 Cal. 153, [43 Pac. 520]; *People v. Newcomer,* 118 Cal. 268, [50 Pac. 405]; *People v. Ellinwood,* 119 Cal. 171, [55 Pac. 553]; *People v. Dobbins,* 138 Cal. 698, [72 Pac. 339]; *People v. Boran,* 139 Cal. 215, [72 Pac. 899].) In many of these cases the instruction approved in the Cronin case was sharply criticised, as in contravention of the constitutional provision that "judges shall

not charge juries with respect to matters of fact," and the trial courts were advised to cease giving it. Finally, in *People* v. *Maughs,* 149 Cal. 253, [86 Pac. 187], the majority of the court declared that "after all this admonition, after all these cautions, the conclusion is forced upon us that when a trial judge does give this instruction to a jury, it can be with no other purpose than to throw his judicial weight into the scales against the defendant on trial before his court. For this reason, therefore, we think the time has come to say that in all future cases which shall arise, and where, after this warning, this instruction shall be given, this court will hold the giving of it to be so prejudicial to the rights of a defendant, secured to him by our constitution and laws, as to call for the reversal of any judgment which may be rendered against him." The opinion in that case was filed in May, 1906. The present case was tried in October, 1905. The declaration in the Maughs case was intended to apply only to cases tried after the opinion in that case had been promulgated, and it cannot be applied to those tried before the trial judges had had the warning therein contained that the giving of the instruction after that warning would by this court be considered evidence of prejudicial unfairness on the part of the trial court toward the defendant. The giving of the instruction in the form above quoted is not so objectionable as the one approved in the Cronin case. It states to the jury a rule regarding the consideration of the defendant's testimony, which every intelligent man upon the panel would doubtless keep in mind, without being reminded of it by the court, and, aside from the fact that it directs attention particularly to a single witness who is a party to the action, it would be covered by the rule laid down in *People* v. *Wardrip,* 141 Cal. 231, [74 Pac. 744]; *People* v. *Farrington,* 140 Cal. 656, [74 Pac. 288]; *People* v. *Moran,* 144 Cal. 65, [77 Pac. 777]; *Goss* v. *Steiger, etc. Works,* 148 Cal. 156, [82 Pac. 681]; *People* v. *Ruiz,* 144 Cal. 253, [77 Pac. 907]; *People* v. *Bin,* 139 Cal. 65, [72 Pac. 505], and *People* v. *Newcomer,* 118 Cal. 268, [50 Pac. 405].) In view of the many previous decisions sanctioning this instruction we do not consider it proper to view the giving of it, prior to the decision in the Maughs case, as evidence of a desire to be unfair, and as the rule of that decision was not intended to be retroactive, it will not be applied.

CLII Cal.—24

We have stated the testimony of the defendant on the question of the jealousy of Scott. Such jealousy, if it existed, would tend to prove a motive, or desire, on the part of Scott to inflict personal injury upon Ryan, and if at the time of the homicide, Ryan had reasonable cause to believe and did believe that such jealousy existed, such belief would be relevant evidence upon the question whether or not he really apprehended danger from Scott and in good faith struck the deadly blows in self-defense. Even if Ryan was unaware of such jealousy, or did not believe it existed, the fact that Scott was jealous of him, if true, would tend in some degree to show that Scott was the aggressor in the fatal encounter. In rebuttal, over the objection and exception of the defendant, the court allowed the wife of Scott to testify that, so far as she knew, Scott had never had, or pretended to have, any jealousy of Ryan. This ruling is assigned as error. It is claimed that the testimony was technically incompetent, that the state of mind of one person cannot be proven by the opinion of another, however intimate, except in the single instance of mental sanity or insanity. Whether this be so or not, we are of the opinion that the testimony was not substantially prejudicial. Strictly speaking, it was not in rebuttal of any fact which the defendant claimed to exist or sought to prove in his defense. It did not tend to disprove the threat made by Scott to Ryan that he would "cut his guts out," and it was not offered for that purpose. Ryan did not testify that Scott was in fact jealous. He said, in effect, that on the first of April when he made the threat, he then thought that Scott was jealous of him, but that he had changed his mind a little in that respect, thus, in effect, stating his opinion that there was no jealousy. Nor did Ryan testify that at the time of the homicide he still believed that Scott was jealous of him, or that he then acted in that belief. He made no such claim. So far as the evidence in defense was concerned, therefore, there was no substantial proof of jealousy on the part of Scott at the time he was killed, and no proof at all that Ryan then supposed that Scott was moved by jealous rage. Such facts are not to be presumed in favor of the defendant and as the testimony of Mrs. Scott could do no more than disprove against defendant a fact which could not be presumed in his favor and which was not proven, nor, in truth, claimed by him to exist, it was, at most, merely technical error and could do no injury.

During the examination of the jurors impaneled to try the case, three of them gave contradictory answers to repeated questions put to them upon the subject of their ability to disregard opinions as to the defendant's guilt, which they had formed from newspaper reports, and public rumor, and from the fact that he had been held for trial, and to decide the case upon the evidence alone. Many persons, competent as jurors, have not given much attention to such subjects, are inexperienced as witnesses, and are unable readily to comprehend the force and effect of the language in which such questions are couched, and they generally answer without reflection as to the effect of their own words. Such contradictions are by no means infrequent, if, indeed, they are not the rule, rather than the exception. The trial court must decide which of the answers most truly shows the juror's mind. It should, of course, be liberal in giving the defendant and the people the benefit of any doubts that may arise as to the fairness of the juror and his ability to lay aside preconceived impressions and should excuse the juror if such doubt is created. But where there are such contradictions its decision is binding upon this court. (*People* v. *Frederick,* 106 Cal. 559, [39 Pac. 944]; *People* v. *Staples,* 149 Cal. 450, [86 Pac. 895]; *People* v. *Ochoa,* 142 Cal. 274, [75 Pac. 847]; *People* v. *Flannelly,* 128 Cal. 86, [60 Pac. 670]; *People* v. *Evans,* 124 Cal. 210, [56 Pac. 1024]; *People* v. *Owens,* 123 Cal. 487, [56 Pac. 251]; *People* v. *Scott,* 123 Cal. 435, [56 Pac. 102].)

There was no error in refusing to allow the witness, Potts, to be recalled after the close of the evidence in rebuttal, to further explain parts of his testimony at the preliminary examination, which had been introduced in rebuttal. In his previous examination he had admitted the giving of the testimony on the former occasion, substantially as proven, and had been given ample opportunity to explain, and had explained in his own way, such trivial discrepancies as had been disclosed. It was not claimed that any additional explanations could be given, and the inconsistencies were of no importance.

The question put to defendant's witness, Cooksey, on cross-examination, inquired concerning a remark imputed to him which tended to show ill will of the witness towards deceased, and it was competent for impeachment. Hence it was proper, in rebuttal, to prove that he made the statement as imputed to him in the question.

This embraces all the questions discussed by the defendant's counsel. We find no prejudicial error in the record.

The judgment and order are affirmed.

Angellotti, J., Sloss, J., Lorigan, J., McFarland, J., and Henshaw, J., concurred.