[Crim. No. 5487. In Bank. Feb. 4, 1954.]

THE PEOPLE, Respondent, v. WALTER THOMAS BYRD, Appellant.

Morris Lavine and Waite & Drapeau for Appellant.

Edmund G. Brown, Attorney General, William E. James, Deputy Attorney General, Roy A. Gustafson, District Attorney (Ventura), and James E. Dixon, Deputy District Attorney, for Respondent.

SPENCE, J.—Defendant Walter Thomas Byrd was charged by indictment with the murder of his wife, Susan. He pleaded not guilty and not guilty by reason of insanity. The jury returned a verdict of guilty of murder in the first degree without recommendation, and he was found sane. His motion for a new trial was denied, and the death penalty was imposed. The appeal is automatic. (Pen. Code, § 1239, subd. (b).)

As grounds for reversal, defendant urges these points: (1) invalidity of the indictment because of incompetency of the grand jury; (2) errors in the charge to the jury, both in giving and refusing to give certain instructions; and (3) insufficiency of the evidence to sustain the verdict. There is no merit to any of these objections, and the judgment must be affirmed.

Defendant, a man 41 years of age, was a chronic alcoholic. He and his wife had been married about 17 years, and they had two children—Gracelee, aged 16, and Connie Sue, aged 6. On December 31, 1952, Mrs. Byrd obtained an interlocutory decree of divorce, in which she was awarded all the community property. Both prior to and after the divorce decree, defendant and his wife had frequent quarrels. Before their divorce, Mrs. Byrd had defendant arrested for an assault upon her, for which he served a 60-day jail sentence; and she also had him committed to the Camarillo State Hospital as an alcoholic, where he stayed for 90 days. In the course of the divorce action, defendant and his wife had several heated arguments relative to a property settlement; and during the few weeks following the divorce, particularly just preceding Mrs. Byrd's death, they quarreled violently over defendant's refusal to sign a quitclaim deed to certain property.

During December, 1952, and January, 1953, defendant was drinking heavily. Then deciding to ''sober up'' and taking some ''nerve tablets,'' defendant on February 3, 1953, went to his wife's home in Santa Susana Knolls to see his family. Mrs. Byrd spoke to him about signing the quitclaim deed to the property. At first, after some argument, he agreed to sign the deed, but when they went to a notary public for that purpose, he again refused to sign. Defendant then left his family and went to his sister's home in Van Nuys, where he spent the night. While there he drank some rubbing alcohol and wine, and took some sleeping pills. The next night about 10 p. m. defendant stole two guns and some shells from a gunshop in Van Nuys. After walking the rest of the night to Santa Susana Knolls, some 25-30 miles, defendant found some friends and he spent the day, February 5, drinking with them. While there, he showed one of the men his guns, and they practiced firing shots. Then, after dozing awhile, defendant started for his wife's home, where he arrived between 7 and 7:30 p. m. A Buick car and his wife's car, a 1947 Chevrolet, were parked in front of the house.

He sat in a vacant lot for a time, and then got into his wife's car, drank some more wine, and dozed from time to time. The owner of the Buick car drove off shortly after defendant's arrival. Almost immediately thereafter a second visitor arrived in a Ford pick-up truck, and he stayed until about 11:30 p. m. Mrs. Byrd retired to her bedroom about 9 p. m., leaving the visitor and her two daughters watching television.

After this visitor left in his Ford pick-up truck, defendant went into the house. Gracelee testified that she heard footsteps and her father's voice say "Sue, is that you?" Her mother answered "Yes" and then something like "Get out of here!" Then she heard a shot and her mother said "Oh, Lee" (as the mother called defendant). She then heard another shot. Gracelee testified that she did not see her father but she recognized his voice, which didn't sound normal but had a high pitch, more like he had been drinking. One shot went through Mrs. Byrd's head causing her death, and another through her shoulder. Defendant testified that after the shooting he walked about a mile, where he found a shack and spent the balance of the night. The next morning he was found by deputies from the sheriff's office and was placed under arrest.

■ Defendant first challenges the validity of his indictment. The People and defendant stipulated that the 1953 grand jury which indicted defendant had as one of its members a juror who had sat on the 1952 grand jury; but it was further stipulated that this juror was not present when the indictment was returned against defendant. Section 199 of the Code of Civil Procedure provides that "a person is not competent to act as a juror" if he has served as such within a year and been discharged. Defendant contends that the deviation here from the statutory provision rendered the entire proceeding void. He relies on *Bruner* v. *Superior Court,* 92 Cal. 239 [28 P. 341], where the competency of a grand jury was successfully attacked because it was summoned by an elisor without first showing that the sheriff was disqualified to perform that duty. Under those circumstances, it was held that the grand jury was a body without semblance of authority, and that any indictment returned by it was a nullity and failed to confer jurisdiction upon the superior court to try the defendant. Concerning this point it was said in *Fitts* v. *Superior Court,* 4 Cal.2d 514, at page 521 [51 P.2d 66]: "A reading of the Bruner case indicates that

it was not decided upon any theory of error or irregularity in the proceedings leading to the impanelment of the grand jury, but that it was based upon the admitted total absence of an essential jurisdictional fact (a finding that the sheriff was disqualified) requisite to the organization of a valid grand jury through the instrumentality of an elisor. . . . Mere irregularities, as distinguished from jurisdictional defects, occurring in the formation of a grand jury will not justify a court declaring an indictment a nullity. (*People v. Murphy,* 71 Cal.App. 176, 180 [235 Pac. 51].) The true distinction lies between the acts of a body having no semblance of authority to act, and of a body which, though not strictly regular in its organization, is, nevertheless, acting under a color of authority. (Citing cases.)''

In the Fitts case certain indictments were claimed to be void and of no effect because found and returned by ''an invalid and unconstitutionally organized grand jury.'' (4 Cal. 2d 517.) It was argued that the grand jury list was not prepared in substantial compliance with the statutory provisions in that it was not the act of a majority of the judges of the respondent court and the names appended thereto were not apportioned among the several wards and townships as required by law; that the judges were biased and prejudiced as to the type of person who should be selected for service and as to the legal requirement that the grand jury be selected by lot. In line with its distinction of the Bruner case, *supra,* the court in the Fitts case held that accepting the claimed errors in the method of impaneling the grand jury ''at their face value,'' such irregularities did not amount to a jurisdictional defect depriving the respondent court's power to proceed with a trial on the indictments, and that the grand jury was at least a *de facto* grand jury, with its acts and proceedings deemed valid and entitled to full credit. (*In re Gannon,* 69 Cal. 541 [11 P. 240].) Likewise here, accepting defendant's claim of error, such irregularity did not affect the validity of the indictment found against defendant. (See *People* v. *Hunter,* 54 Cal. 65; *People* v. *Simmons,* 119 Cal. 1 [50 P. 844]; *McFarland* v. *Superior Court,* 88 Cal.App.2d 153, 160 [198 P.2d 318].)

Defendant next challenges the correctness of certain instructions. ■ The jury was instructed: ''You may not consider the matter of punishment in determining whether or not the defendant is guilty, or if you find him guilty, in determining the crime or degree of crime of which he is

guilty. However, if you find the defendant guilty of murder of the first degree, you may then consider the consequences of the two possible sentences in determining what punishment the defendant should receive. *A prisoner sentenced to either death or life imprisonment may be pardoned or may have his sentence reduced by the Governor. A prisoner serving a life sentence may be paroled, but not until he has served at least seven years."* (Emphasis added.) It is contended that this instruction, following certain argument by the prosecutor, seriously prejudiced defendant before the jury. The district attorney first stated that life imprisonment would not be a satisfactory punishment for the crime committed, although it might be if it meant that defendant would actually be imprisoned for life. But he added, "in California the law is that a man under a life sentence is eligible for parole after seven years . . . and . . . any [imprisonment] short of life is not punishment" for defendant "because he is accustomed to being in jail. . . . That is no punishment for him. . . . He will go out and do something right away again in five months later, six months later, or a year later. . . . When he comes out, who knows what resentment he is going to bear and against whom? It can be anybody. Maybe it will be one of his family; maybe it will be Gracelee; it might be the judge, might be me, might be you, you can't tell."

In *People* v. *Barclay,* 40 Cal.2d 146 [252 P.2d 321], the matter of enlightening the jurors on the consequences of the penalties which they may impose in the event of a verdict of guilty of murder of the first degree was considered. There it was said at pages 157-158: "When a defendant is convicted of murder in the first degree, the jury determines his punishment as well as his guilt. (Pen. Code, § 190; *People* v. *Sainz,* 162 Cal. 242, 246-247 [121 P. 922] . . .) Since the issues of punishment and guilt are determined at the same time, there is danger that evidence or instructions offered on the former issue may influence the verdict on the latter issue. Accordingly, to avoid prejudice to either the People or the accused by injection of collateral issues into the case, evidence of the good or bad habits and background of the accused is generally held inadmissible . . . and the consideration of the jury is limited to the facts and circumstances attending the commission of the offense itself. (Citing authorities.) For similar reasons of policy the jury is not allowed to weigh the possibility of parole or pardon in

determining the guilt of the defendant, and it is therefore error to give an instruction that allows the jury to take into consideration the consequences of a recommendation of life imprisonment in arriving at that determination. (See *People* v. *Letourneau*, 34 Cal.2d 478, 494 [211 P.2d 865].) To aid the jury in fixing the punishment of the defendant, however, the court may instruct the jury as to the consequences of the different penalties that may be imposed so that an intelligent decision may be made. (Citing authorities.)'' The instruction here challenged was expressly concerned with defendant's punishment *if* defendant was *first* found *guilty of murder of the first degree,* and in line with the above-noted distinction between the two issues, the court properly informed the jury as to the possible consequences of the imposition of a sentence of either death or life imprisonment. (40 Cal.2d 158.)

Defendant's counsel made no objection to the district attorney's argument relative to the effect of punishment on defendant nor was the court requested to instruct the jury to disregard his remarks. (*People* v. *Kirkes*, 39 Cal.2d 719, 726 [249 P.2d 1].) While the district attorney may have been overly zealous in his statements, defendant may not now complain. This is not a case where the comment was of such character that any possible harmful effect would not have been obviated by a timely admonition or instruction to the jury (*People* v. *Podwys*, 6 Cal.App.2d 71, 76 [44 P.2d 377]) or where the evidence was closely balanced, presenting grave doubt as to defendant's guilt, so that the assailed argument of prosecuting counsel may have contributed materially to the verdict (*People* v. *Berryman*, 6 Cal.2d 331, 337 [57 P.2d 136]; see *People* v. *Sampsell*, 34 Cal.2d 757, 764 [214 P.2d 813]).

Defendant next contends that an instruction on the killing as perpetrated by means of lying in wait was improperly submitted to the jury. He does not claim that it misstates the law. (*People* v. *Tuthill*, 31 Cal.2d 92, 99 [187 P.2d 16].) But he takes the position that the facts did not warrant such a premise of guilt, and the instruction removed from the jury the right to consider whether or not the killing was wilful, deliberate and premeditated. If the killing was committed by lying in wait, it was murder of the first degree by force of the statute (Pen. Code, § 189; *People* v. *Sutic*, 41 Cal.2d 483, 492 [261 P.2d 241]), and the question of premeditation was not further involved. (*People* v. *Tuthill, supra*, 31 Cal.2d 92, 99 .) Defendant argues

that the evidence showed only that he was in his wife's parked automobile drinking wine and dozing, and not that he was waiting near his wife's house for the purpose of taking her unawares. But the jury was not required to believe defendant's story. . The evidence showed that defendant was armed with a .32 Colt pistol during the four hours that he waited near his wife's house; that immediately upon departure of the last visitor, defendant entered the house and, according to his own admission, fired the gun at the bed in which his wife was lying. The elements of waiting, watching and concealment were all present as a basis for the instruction on lying in wait (*People* v. *Sutic, supra,* p. 492), and the jury might well have based its verdict on that theory of the case.

Defendant next argues that the court improperly instructed the jury regarding his interest in his wife's estate as the result of her death without leaving a will. He claims that the instruction incorrectly stated the law and also operated to his prejudice in suggesting a possible motive for his having killed her. According to the evidence, defendant's wife was awarded the family home by the interlocutory decree of divorce, which had become final at the time of the trial. Such decree was a final adjudication of the issues thereby determined (*Leupe* v. *Leupe*, 21 Cal.2d 145, 148 [130 P.2d 697]), and the family home thereby became the separate property of defendant's wife. But inasmuch as the parties remained husband and wife until entry of the final decree, defendant was entitled as the surviving spouse to share in his wife's estate (Prob. Code, § 221) unless he was convicted of murdering her (Prob. Code, § 258). These were matters for the court's judicial notice. (Code Civ. Proc., § 1875.) As a recital of defendant's property interest which continued to exist until defendant's final conviction, the instruction correctly stated the law and was properly given. (*Estate of Agoure*, 165 Cal. 427, 428 [132 P. 587].)

Defendant also attacks the court's instructions on the matter of fixing the penalty. After telling the jury that upon a conviction of murder of first degree, it was within its discretion to impose either the death penalty or life imprisonment, the court continued: "The discretion which the law invests in you is not an arbitrary one and is to be employed only when you are satisfied that the lighter punishment should be imposed. *If you find the defendant guilty*

*of first degree murder and do not find extenuating facts or circumstances to lighten the punishment, it is your duty to find a verdict of murder in the first degree and fix the penalty at death.''* (Emphasis added.) Defendant contends that such instruction placed on him the burden of showing extenuating facts or circumstances as the basis for the jury's imposition of the lighter punishment whereas the statute contains no such proviso purporting to control the jury's exercise of discretion in the matter of fixing the penalty. (Pen. Code, § 190.) This precise question was presented in *People* v. *Williams,* 32 Cal.2d 78, 85-86 [195 P.2d 393], and after a review of the earlier cases, it was concluded that such instruction has been consistently held ''not erroneous'' inasmuch as ''the discretion conferred upon the jury by section 190 of the Penal Code should not be arbitrarily exercised for or against a defendant, but should be influenced by the evidence in the case . . . controlled by reason and justice under the facts of the particular case.'' (P. 86.) The decision in the Williams case is a complete answer to defendant's contention.

Defendant further contends that certain tape recordings of conversations between himself and a deputy district attorney, in the presence of police officers, constituted confessions and were admitted in evidence without any foundation being laid concerning the voluntary character thereof, and without thereafter giving defendant's requested instructions concerning the necessity that such confessions be voluntary.

The portion of defendant's argument which is directed to the point that an involuntary confession may not be used either for the purpose of proving the crime confessed or for the purpose of impeaching the defendant is sustained by authority. (*People* v. *Raucho,* 8 Cal.App.2d 655, 670 [47 P.2d 1108]; *People* v. *Bateman,* 80 Cal.App. 151, 158 [251 P. 335]; see, also, *People* v. *Clifton,* 186 Cal. 143, 149 [198 P. 1065].) But when these tape recordings were offered in evidence defendant made no objection that a proper foundation had not been laid or that the contents thereof were made involuntarily; and on this appeal defendant has been unable to support such a claim by any evidence in the record. It would appear that a proper objection at the time of trial could have been met by the prosecution, for there is ample support in the record before us that the confessions were voluntary, and there is no evidence which would justify a contrary finding.

Defendant's requested instruction defining an involuntary confession and his requested instruction on the necessity that the confession must be voluntary were properly refused. The first instruction dealt with involuntariness induced by violence, threats, promised immunity or other inducements but, as above indicated, there is no evidence in the record which could support a conclusion of such improper conduct. Defendant's counsel now asserts that the statements in the tape recordings were involuntarily made because they were made while defendant was under the influence of intoxicating liquor. Even if such a condition did exist, it did not make the confessions inadmissible. This court has declared that intoxication at the time of making confessions does "not deprive the confessions of the required spontaneity to make them free and voluntary." (*People* v. *Dorman,* 28 Cal.2d 846, 854 [172 P.2d 686].) We conclude that the trial court properly refused to give either of the requested instructions here because no rational conclusion could be drawn from the evidence other than that the confessions were free and voluntary.

 Since it appears that the confessions in the tape recordings were voluntary, the various aspects thereof could have been used for impeachment or as affirmative evidence of guilt. (*People* v. *Southack,* 39 Cal.2d 578, 585 [248 P.2d 12].) However, at the time the recordings were offered in evidence the district attorney stated: "I am offering these portions of the recording which were quoted by me to the defendant on the witness stand in cross examination for the purposes of impeachment and the remainder of the recording for the sole and limited purpose of showing the nature of the defendant's voice, his physical condition as revealed by his voice, and his nervous condition, or lack thereof, as revealed by the voice on the tape recording." This evidence was objected to as "inadmissible" but solely on the theory that "it is not proper to save any portion of the case in chief to be introduced at this time." The district attorney then stated that he could not have impeached the defendant until after he had testified.

Defendant's objection that the evidence should have been presented in the prosecution's case in chief and not subsequently in the guise of impeachment is similar to the objection made in *People* v. *Avery,* 35 Cal.2d 487, 491 [218 P.2d 527], and in *People* v. *Rodriguez,* 58 Cal.App.2d 415, 418 [136 P.2d 626]. While the practice by the prosecution of withholding such evidence for the purpose of using it

later for impeachment was condemned in the cited cases, it was recognized that the order of proof rests in the sound discretion of the trial court. (*People* v. *Avery, supra,* p. 491.) ▇ Under the circumstances presented here, we find no abuse of discretion in the ruling admitting the tape recordings. Furthermore, defendant has failed to show any prejudice resulting from the alleged procedural error.

▇ Defendant also argues that the court erred in not giving the "statutory definition" of first and second degree murder, and in not fully defining the term "deliberation." The following portion of one of defendant's proposed instructions was omitted: "To constitute a deliberate and premeditated killing, the slayer must weigh and consider the question of killing and the reasons for and against such a choice and, having in mind the consequences, decide to and commit the unlawful act causing death." Contrary to defendant's assertion, these words are not part of any statutory definition although the omitted words would have constituted a proper portion of an instruction. (*People* v. *Carmen,* 36 Cal.2d 768, 778 [228 P.2d 281].) ▇ The record shows, however, that the instructions given fully and fairly advised the jury concerning the distinction between first and second degree murder, and also regarding the meaning of deliberation and premeditation. Thus, after giving the statutory definition of murder (Pen. Code, § 187) and its classification as murder of the first degree if the killing is "willful, deliberate and premeditated" . . . with malice aforethought (Pen. Code, § 189), the court continued: "The word 'deliberate' means formed or arrived at or determined upon as a result of careful thought and weighing of considerations for and against the proposed source of action. The word 'premeditated' means thought over beforehand." (*People* v. *Honeycutt,* 29 Cal.2d 52, 61 [172 P.2d 698].) The law, however, does not require that the thought of killing be pondered over for any specified length of time in order for the killing to be considered deliberate and premeditated. "The time will vary with different individuals and under varying circumstances. The true test is not the duration of time, but rather the extent of the reflection. A cold, calculated judgment and decision may be arrived at in a short period of time, but a mere unconsidered and rash impulse, even though it include an intent to kill, is not such deliberation and premeditation as will fix an unlawful killing as murder of the first degree." (*People* v. *Carmen, supra,* 36 Cal.2d 768, 778.) "A killing

of a human being with malice aforethought, but without deliberation and premeditation and not perpetrated by means of lying in wait, is murder of the second degree." (Pen. Code, § 189.) In addition, the court gave a full instruction on malice and also on manslaughter as distinguished from murder. A review of the record shows that the instructions given satisfy the requirements of the law as recently stated by this court. (*People* v. *Daugherty*, 40 Cal.2d 876, 901-902 [256 P.2d 911].)

Finally, defendant contends that the evidence is insufficient to sustain the verdict; that he should have been convicted either of second degree murder or manslaughter, and that this court should reduce the degree of the crime pursuant to the authority conferred by section 1181, subdivision 6, of the Penal Code. In this connection defendant argues that he was a chronic alcoholic; that at the time of the killing he was intoxicated, had been taking sleeping pills, and had been doing so for a long period of time. He claims that under these conditions he was not capable of forming an intent or of premeditation. The jury was fully instructed in the language of the statute (Pen. Code, § 22) on the effect of voluntary intoxication, its bearing on a person's ability to form an intent, and its relevancy insofar as affecting the degree of the crime. (*People* v. *Griggs*, 17 Cal.2d 621, 625 [110 P.2d 1031].)

A review of the record shows that there was ample evidence from which the jury could have concluded that the murder was perpetrated by lying in wait and that it was the result of prolonged premeditation and deliberation. ▮ Direct evidence of a deliberate and premeditated purpose to kill is not required to sustain a conviction of first degree murder. Deliberation and premeditation may be inferred from proof of such facts and circumstances as will furnish a reasonable foundation for such an inference. (*People* v. *Guldbrandsen*, 35 Cal.2d 514, 519 [218 P.2d 977].) ▮ As the evidence was sufficient to sustain the conviction of murder of the first degree (Pen. Code, § 189), this court would not be authorized to reduce the degree of the crime (Pen. Code, § 1181, subd. 6; *People* v. *Daugherty, supra,* 40 Cal.2d 876, 884) or to reduce the penalty from death to life imprisonment (Pen. Code, § 1260; *People* v. *Jackson*, 36 Cal. 2d 281, 288 [223 P.2d 236]; *People* v. *Thomas*, 37 Cal.2d 74, 77 [230 P.2d 351]).

214

The judgment and the order denying a new trial are affirmed.

Gibson, C. J., Shenk, J., and Edmonds, J., concurred.

CARTER, J.—I dissent.

The court here instructed the jury that "The law of this state provides that every person guilty of murder in the first degree shall suffer death or confinement in the state prison for life, at the discretion of the jury that finds him guilty. If you should find the defendant guilty of murder in the first degree, it will be your duty to determine which of the two penalties shall be inflicted, the death penalty or confinement in the state prison for life.

"The discretion which the law invests in you is not an arbitrary one and is to be employed only when you are satisfied that the lighter punishment should be imposed. *If you find the defendant guilty of first degree murder and do not find extenuating facts or circumstances to lighten the punishment, it is your duty to find a verdict of murder in the first degree and fix the penalty at death.* There will be handed to you for your use appropriate forms of verdict." (Emphasis added.)

The emphasized portion of the instruction should not have been given. It has not been, and should not be, the law of this state. Section 190 of the Penal Code provides that "Every person guilty of murder in the first degree shall suffer death, or confinement in the state prison for life, *at the discretion of the jury trying the same*; . . ." (Emphasis added.) The statute leaves the determination of punishment for first degree murder to the discretion of the jury *alone*, directing only that it be death or life imprisonment. To permit the court to inform the jury that before life imprisonment may be imposed, there must be extenuating circumstances is to permit judicial invasion of the province of the jury and constitutes an interference with its exercise of the discretion directed by the statute. The statute leaves the penalty to the *sole* discretion of the jury; a majority of this court deprives this defendant of the right to a jury trial on the issue of penalty by condoning an instruction which tells the jury it may *not* fix the penalty at life imprisonment *unless* it finds that extenuating circumstances existed.

In Mr. Justice Schauer's dissent in *People* v. *Williams*, 32 Cal.2d 78 [195 P.2d 393], a case involving the same

erroneous instruction, he traced the origin of the error which a majority of this court now sanctions once more. He showed that it began with specious reasoning in *People* v. *Welch* (1874), 49 Cal. 174, and that it has, from time to time, been followed until the present time. In *People* v. *Bollinger,* 196 Cal. 191, 209 [237 P. 25], the question was once again discussed and the cases holding the giving of such an instruction not to be error once again cited. The court there said: "We have, however, gone into the subject in the hope, if not the expectation, that the practice of giving such instructions may be abated, thus giving assurance that the penalty reflects the decision of the jury alone and at the same time sparing this court the necessity of repeatedly passing on such assignments of error. And considering the numerous occasions this court has held that section 190 of the Penal Code confers on the jury alone the discretion of determining the punishment in cases of guilt of murder in the first degree, trial courts, especially where a human life is at stake, should not interfere with the discharge of that solemn duty by the jury." As Mr. Justice Schauer said (dissent, *People* v. *Williams, supra,* 32 Cal.2d 78, 96): "The denounced practice has been continued *because this court has tolerated it and the evil instruction will continue in use until this court finally enforces what it has so often recognized to be the law."* In *Winston* v. *United States, Strather* v. *United States, Smith* v. *United States,* 172 U.S. 303 [19 S.Ct. 212, 43 L.Ed 456]; *Andres* v. *United States,* 333 U.S. 740 [68 S.Ct. 880, 92 L.Ed. 1055], the Supreme Court reversed judgments of conviction where a statute similar to ours was concerned and instructions invading the province of the jury, as here, were given. "The proper practice for the trial court is to refrain from giving any instructions which might have a tendency in the slightest degree to influence or control the discretion of the jury in its determination of the proper penalty in a case where the defendant is charged with murder in the first degree." (*People* v. *Martin,* 12 Cal.2d 466, 470-471 [85 P.2d 880].) Prior to and including the Williams case, this court deplored, while condoning, the error of the instruction (see *People* v. *Bawden,* 90 Cal. 195 [27 P. 204]; *People* v. *Rogers,* 163 Cal. 476 [126 P. 143]; *People* v. *Bollinger, supra,* 196 Cal. 191; *People* v. *Ross,* 134 Cal. 256 [66 P. 229]; *People* v. *Smith,* 13 Cal.2d 223 [88 P.2d 682]; *People* v. *Kolez,* 23 Cal.2d 670 [145 P.2d 580]). In the case at bar, we are told by the majority that the question of whether or not the giving of

the instruction was prejudicial error is completely answered by the decision in the Williams case.

The instruction under consideration is not always given when a defendant is charged with first degree murder. In those cases where it is not given and where the discretion conferred by statute (Pen. Code, § 190) ·is left wholly to the jury trying the case, the defendant is given his right to a jury trial upon all the issues including that of imposition of penalty. In cases where the instruction is given, the defendant is deprived of his right to a jury trial upon the issue of imposition of penalty. Is this equal protection under law? Is not the rule now, as it has always been, that those in the same class shall receive equal protection and equal rights? It appears to me that all defendants accused of murder in the first degree are members of the same class. For the purpose of this argument, what occurs at the trial in the matter of proof is unimportant. If they are so accused and stand trial before a jury, then they stand in the same position. Suppose that there are two defendants charged with murder in the first degree. In one instance, the jury is instructed in the language of the statute that the penalty to be imposed rests in its discretion.; in the other, the jury is charged with the instruction here under consideration—that it must give the death penalty unless it finds "extenuating facts or circumstances to lighten the punishment." What are these extenuating facts and circumstances? Conduct on the part of the deceased or conduct of the defendant? If the matter is left to the discretion of the jury as directed by the statute, many human frailties might be taken into consideration with a view toward achieving justice. An examination of the record in the case at bar shows no instruction given which defined "extenuating facts and circumstances." It appears to me that the error of the instruction is compounded by leaving to the jury the problem of determining just what facts and circumstances would be considered extenuating in a legal sense. If the language of the statute which leaves the matter of penalty to the discretion of the jury alone is not observed, have such defendants been accorded due process of law? When a jury has been told that in order to fix the penalty at life imprisonment it must find "extenuating facts or circumstances," can it be said that the defendant has not been seriously injured in his right to *life*? As was said in *Andres* v. *United States, supra,* 333 U.S. 740, "In death cases doubts such as those presented here should be resolved in favor of

the accused." The perpetuation of the serious error of this instruction has the effect of resolving all doubts in favor of the state. Apparently now it is to be the court-made law of this state that the instruction is not erroneous. Mr. Justice Traynor, in his dissent in *People* v. *Kolez, supra,* 23 Cal.2d 670, 675, said that this court has been unwilling to overrule the cases holding that it was not error to give the instruction in question but has also been unwilling to hold that it was proper to give it. That "It has thus placed itself in the inconsistent position of tolerating the giving of an instruction that it condemns. It has sought to overcome this inconsistency by admonishing trial courts not to give the instruction. There can be no such middle ground, however. If the instruction is not erroneous it is quite proper for trial courts to give it and an unwarranted interference for this court to admonish them not to give it. If the instruction is erroneous it should be held to be so outright. The dilemma is not resolved but perpetuated when this court, in deference to precedent, sanctions an incorrect instruction and at the same time admonishes the trial court to cease giving it. The repeated disregard of such admonitions demonstrates that if the correct rule is to be applied, this court must join in its enforcement and reverse the judgments of trial courts that vitiate it. Disregard of admonitions of this court in the past has been held to indicate an attempt to influence the jury improperly and therefore to constitute ground for reversal. (*People* v. *Maughs,* 149 Cal. 253, 263 [86 P. 187]; *People* v. *Costello,* 21 Cal.2d 760 [135 P.2d 164]; see *People* v. *Ryan,* 152 Cal. 364 [92 P. 853].)"

It also appears to me that the evidence is insufficient to justify the giving of an instruction on lying in wait. Ordinarily, the jury determines the state of mind of the defendant and the degree of the homicide from all of the circumstances of the case. A finding that a murder was by lying in wait, however, necessitates a verdict of first degree murder and takes from the trier of fact the further question whether it was willful, deliberate, and premeditated. (*People* v. *Thomas,* 41 Cal.2d 470, 478 [261 P.2d 1], concurring opinion; *People* v. *Bernard,* 28 Cal.2d 207, 211 [169 P.2d 636]; *People* v. *Murphy,* 1 Cal.2d 37, 41 [32 P.2d 635].) The nature of the act by which the murder was committed outweighs all other circumstances. The dangers inherent in such a rule have been forcefully pointed out. (Moreland, The Law of Homicide, pp. 197-198, 206-207.) The greatest danger is

that if the rule is improperly invoked a defendant may be found guilty of murder in the first degree even though there is no evidence of lying in wait and the jury did not reach the question of premeditation and deliberation. Although there was ample evidence of premeditation and deliberation in the present case to support a verdict of first degree murder on that ground, under the instruction on lying in wait the jury may have concluded that the crime was perpetrated by lying in wait and thus may never have reached the question of premeditation and deliberation. Although defendant was waiting and watching for his wife's visitor to leave, there is no evidence that the shots were fired from a position of concealment. Defendant entered his wife's house, spoke to her, and fired the shots that killed her. The victim was aware of defendant's presence and no more is shown than that he did not tell her in advance that he would kill her. That circumstance is not enough to require the jury to return a verdict of first degree murder. The instruction is prejudiciously erroneous since it permitted the jury to return a verdict of first degree murder without first finding premeditation and deliberation.

For the reasons above stated, I would reverse the judgment.

Schauer, J., concurred.

TRAYNOR, J., Dissenting.—I concur in the conclusions and reasoning in the dissenting opinion of Mr. Justice Carter except that I do not agree with any implications therein that defendant was denied due process of law or equal protection of the laws.

Appellant's petition for a rehearing was denied March 3, 1954. Carter, J., Traynor, J., and Schauer, J., were of the opinion that the petition should be granted.