[Crim. No. 6540.    Second Dist., Div. Two.    Jan. 13, 1960.]

THE PEOPLE, Respondent, v. GEORGE BUSH, JR., Appellant.

118

Ellery E. Cuff, Public Defender, under appointment by the District Court of Appeal, and Richard W. Erskine, Deputy Public Defender, for Appellant.

Stanley Mosk, Attorney General, William E. James, Assistant Attorney General, and Jack K. Weber, Deputy Attorney General, for Respondent.

HERNDON, J.—Appellant was charged with the murder of one Thomas King. The information alleged that appellant had served a term in state prison after a prior conviction of manslaughter. Appellant at first denied but later admitted the former conviction. After a jury trial, appellant was found guilty of murder in the second degree and sentenced to state prison.

The two grounds upon which a reversal is sought are stated in appellant's opening brief as follows:

"I. *There being no evidence to support a finding of murder in the first degree, it was error for the court to have instructed the jury on murder in the first degree, and to have left to the jury the possibility of a finding of guilty of murder in the first degree.*"

"II. *The Deputy District Attorney was guilty of prejudicial misconduct in openly expressing his belief that one of the eye-witnesses called by the prosecution was lying.*"

The killing occurred at about 11:30 p. m. on May 11, 1958, at a pool hall located on South Central Avenue in Los Angeles. It is undisputed that the victim, Thomas King, died as a result of stab wounds in the chest and neck, inflicted by appellant in the course of an altercation between the two men. The prosecution called two eyewitnesses, Washington and McGlothen, whose testimony as to their observations with respect to the details of the altercation appears to be somewhat conflicting.

Washington testified that he had known appellant and King prior to the evening in question; that on that evening at about 11:30 p. m. he saw appellant and King in the pool hall and heard King say to the appellant that "he didn't want to talk to him because he would have to hit him in his mouth." Appellant said "he won't hit him in his mouth." At that time appellant had taken a knife from his pocket. According to Washington, appellant opened the knife, grabbed King and "stuck him in the neck," and then plunged the knife into his chest. Washington's further observations are reflected by the following questions and answers: "Q. And what about Mr. King; did you see him with a knife? A. No, I didn't. Q. Where were Mr. King's hands at the time that Mr. Bush struck Mr. King in the neck and later in the chest with this knife? A. Down by his side. Q. And were his hands up at any time in a moving motion towards Mr. Bush—I say 'he'—I mean Mr. King's hands moving towards Mr. Bush? A. Yes, they was up, after he struck him his hands was up. Q. After the striking? A. Yes. Q. And after that, then what happened? A. Well, we got them apart and Bush walks on out the door. King, he walks first towards the front door and fell." The same witness further testified that the victim did not use profanity during the episode and did not appear to be angry.

McGlothen testified that he saw what appeared to be a fight between the two men. King walked up to the appellant talking to him and slapped a cigarette out of his mouth. King said he did not like anyone that owed him money and did not pay, and addressed appellant with profane language. Thereupon appellant hit King. Apparently referring to the time of the striking, McGlothen said: "I couldn't say that I did see Mr. Bush with a knife in his hand." However, the witness testified that after the men had been separated, he thought he saw a knife in appellant's hand. This witness heard King say to appellant "not to say anything or he would hit him in the mouth." King told appellant to go ahead and open his knife. Whereupon, appellant was observed to strike King in the neck. McGlothen testified that he stood 10 or 12 feet from the participants in the fracas but that between the time when he saw the cigarette slapped out of appellant's mouth and the time when appellant struck King in the neck, he had retreated with his back to the scene.

Appellant signed a statement for the police which he acknowledged was free and voluntary, reading as follows: "Well, he walked in the place and so I spoke to him and he used some four (sic) words so I just told him I was sorry. He started his hand down towards his pocket and I thought he was going for his knife, so I went for mine, so he told me to go ahead and open my knife and he would bust me in the mouth. I opened my knife and started pushing it towards his stomach, and he started pushing me back. I cut him about two or three times."

Testifying in his own behalf, appellant stated that King had taken him home on one occasion and appellant had promised he would give him a dollar the next time he saw him. Afterwards on two or three occasions King had asked him for the dollar, although he had previously paid it. According to appellant, the deceased had threatened him concerning the alleged debt some three or four weeks before the killing. Appellant had seen King pull his knife on another man on a different occasion and on still another occasion had seen him threaten to use a knife. Appellant's version of the altercation was as follows: "He had walked in. When I noticed him, he was standing on the left side, so I spoke to him, said 'Hi, King.' He told me not to never speak to him any more. I told him I was sorry. He said, 'Didn't I tell you the next time you speak to me I was going to hit

you in the mouth,' and he used profanity. I told him no, he wasn't going to hit me in the mouth. I remember I put a cigarette in the mouth. He slapped the cigarette out of my mouth. I just backed (sic) out or something. I don't hardly remember anything else from there on out.'' Appellant testified that he was frightened and that when King ''started his hand down to the side, . . . that is when I pulled the knife.'' Appellant thought ''he was going to put a knife in me.''

The court instructed the jury on murder in the first degree, murder in the second degree, manslaughter and justifiable homicide and submitted forms of verdict which left to the jury the question whether to return a verdict of not guilty or a verdict of guilty of one of the above enumerated crimes. We have concluded that the trial court did not err in so instructing the jury and in so submitting the case.

Since our Supreme Court in several comparatively recent decisions has given us thorough and comprehensive expositions of the legal principles which govern in defining murder and in differentiating between the two degrees of that crime, it would be a work of supererogation for us to attempt a further clarification of those guiding rules. (*People* v. *Holt,* 25 Cal.2d 59 [153 P.2d 21]; *People* v. *Thomas,* 25 Cal.2d 880 [156 P.2d 7]; *People* v. *Bender,* 27 Cal.2d 164 [163 P.2d 8]; *People* v. *Carmen,* 36 Cal.2d 768 [228 P.2d 281]; *People* v. *Byrd,* 42 Cal.2d 200 [266 P.2d 505]; and see 25 Cal.Jur.2d 601 et seq., Homicide, § 92, and decisions cited.) ■ It suffices for present purposes to observe that under the rules enunciated in the decisions above cited the trial court was warranted in allowing the jury to consider returning a verdict of guilty of first degree murder if, and only if, there was substantial evidence in the record from which the jury reasonably could have inferred all the elements of first degree murder, including, in addition to malice, the elements of deliberation and premeditation.

■ In *People* v. *Bender, supra,* at pages 180-181, it is stated: ''It is implicit in the above-quoted definitions that malice aforethought is, as above mentioned, an essential element of murder of the second as well as of the first degree and that such malice aforethought is not synonymous with the elements of deliberation and premeditation which must accompany a homicide to characterize it as murder of the first degree. Obviously, if malice aforethought necessarily

included or presupposed a deliberate and premeditated intent then all murder would be of the first degree because any homicide, to constitute murder at all, must be an unlawful killing with malice aforethought; and the Legislature would be guilty of an utterly meaningless classification of murder into two degrees, with no field in which the second could operate. Likewise it is obvious that the mere intent to kill is not the equivalent of a deliberate and premeditated intent to kill.''

It is equally well-settled, however, that the law ''does not require that the thought of killing be pondered over for any specified length of time in order for the killing to be considered deliberate and premeditated.'' (*People* v. *Byrd*, *supra*, 42 Cal.2d 200, 212.) And, as stated in *People* v. *Carmen*, *supra*, 36 Cal.2d 768, 778: '' 'The law does not undertake to measure in units of time the length of the period during which the thought must be pondered before it can ripen into an intent to kill which is truly deliberate and premeditated. The time will vary with different individuals and under varying circumstances. The true test is not the duration of time, but rather the extent of the reflection. . . .' ''

In the case at bar the jury could well have drawn from the evidence the picture of a cold, deliberate and premeditated murder. There was evidence that an enmity between appellant and deceased had developed over a period of several weeks. The description of the killing as given by the witness Washington portrayed the victim as standing with his hands at his sides in an attitude that was neither angry nor threatening. It portrayed appellant deliberately drawing a knife and stabbing the decedent first in the neck and again in the chest. Despite the inconsistencies and contradictions in the testimony of the several witnesses, the jury was entitled to believe such parts thereof as appeared to them to be worthy of credence. And it reasonably could be inferred that appreciable periods of time elapsed between the several acts of the participants making up this tragic episode which ended in violent death. It was for the jury to decide from the circumstances at what stage of the affair appellant made up his mind to kill the deceased, and as stated in *People* v. *Bender*, *supra*, 27 Cal.2d 164, at page 184: ''We do not undertake to say, as a matter of law, how long a thought must be pondered before it can be said to be deliber-

ated and premeditated. That is fundamentally a question of fact for the jury in each case under proper instructions.''

The jury in the instant case heard the rather unsatisfactory testimony of the defendant as well as the testimony of the eyewitnesses called by the prosecution. The jurors in their evaluation of the testimony, and in arriving at their conclusions as to the probable state of mind which accompanied the described acts of appellant, could have been greatly aided by their observations of appellant's demeanor.

■ However, assuming *arguendo,* that the evidence was not sufficient to support the finding essential to a verdict of first degree murder, appellant suffered no prejudice because the verdict actually returned by the jury was murder in the second degree. Appellant does not deny, and obviously could not deny, that there is an abundance of evidence to support the verdict returned. Thus, if it be assumed that the present record reveals insufficient evidence of deliberation and premeditation, then this case would have to be regarded as being in essentially the same posture as *People* v. *Bender, supra,* 27 Cal.2d 164, where the Supreme Court found such an insufficiency of evidence to exist and for that reason modified a judgment of conviction of first degree murder by reducing it to murder of the second degree. If the jury in this case had returned a verdict of first degree murder, and if we had concluded that there was insufficient evidence of deliberation and premeditation to sustain such verdict, we properly could have adopted the following language from *Bender* (pp. 186 and 187): ''Since there is no substantial evidence from which it reasonably can be inferred that defendant either formed or carried out the intent to kill deliberately, and with premeditation, in the ordinary meaning of those words, the judgment upon the finding of murder of the first degree cannot be sustained. The evidence, however, amply supports the other findings necessarily implied in the verdict of the jury. The error in instructing as to the degree of the homicide does not enter into the finding that defendant is guilty of 'the unlawful killing of a human being, with malice aforethought' (Pen. Code, § 187) and there were adequate instructions on the subject of manslaughter.''

In *People* v. *McGee,* 31 Cal.2d 229 [187 P.2d 706], the Supreme Court held that it was not error under the circumstances of that case to instruct the jury that murder committed in certain ways or in the perpetration of certain

crimes is of the first degree, notwithstanding the absence of any evidence that the homicide in question was so committed. In that case, however, it was observed that only forms of verdict of guilty of second degree murder, manslaughter, and not guilty were given to the jury.

In *People* v. *Deacon*, 117 Cal.App.2d 206 [255 P.2d 98], the jury was instructed on first degree murder and the penalty therefor, but was also instructed in effect that if the defendant was guilty of murder, it was only murder in the second degree. The appellate court held that the defendant suffered no prejudice from the giving of the instructions on first degree murder, commenting (at p. 210) : "If it was surplusage (and admittedly the instruction on the penalty for first degree murder is such) it cannot be complained of as prejudicial, for appellant was after all convicted of second degree murder, not first."

In *People* v. *Chaves*, 122 Cal. 134 [54 P. 596], defendant was convicted of first degree murder. On appeal it was urged that there was prejudicial error in the giving of a superfluous instruction concerning poison, lying in wait, torture, arson, robbery, rape, etc. In rejecting the contention the Supreme Court observed at page 141: "This criticism has no merit, and deserves no particular notice. Obviously it was the right and duty of the court to state the law in regard to the offense, and the degrees into which it is divided as declared by the statute, and such statement did not and could not have prejudiced the defendant."

As the foregoing quotation suggests, it is necessary as a practical matter in the instruction of a jury in a murder case to define both degrees of the crime in order to differentiate between the two. In the instant case there is no claim that any instruction given was incorrect in its statement of the law. Thus, it seems clear that no prejudicial error was committed in this respect.

■ Appellant's second assignment of error is based upon actions of the deputy district attorney when a prosecution witness gave testimony which evidently surprised the deputy and caused him first to claim surprise, and then to take initial steps in laying a foundation for impeachment. At the preliminary hearing the witness McGlothen had testified to having seen a knife in appellant's hand. At the trial, however, he testified: "I couldn't say that I did see Mr. Bush with a knife in his hand. Although I did make a statement saying

that he had one, but at the time I imagine that was just an assumption.''

Upon the giving of the last quoted answer, the deputy district attorney requested of the court: ''Would you please advise this witness what the crime of perjury is?'' After appellant's objection to this as an attempt ''to impeach his own witness,'' discussions were had between court and counsel outside the hearing of the jury. The deputy district attorney then apparently began to lay a foundation for impeachment. He proceeded to the point of asking the witness to read the testimony which he had given at the preliminary hearing. At this point the court took its morning recess. During the recess, the witness evidently explained that what he meant to say was that he had seen the knife in appellant's hand *after* the altercation but not *during* it. In any event, the district attorney proceeded no further with the impeachment but continued with his direct examination of the witness.

It does not appear that appellant made any further objection or sought any admonition or instruction relative to this matter. In the circumstances appearing, the actions of the district attorney were understandable and undoubtedly were taken in good faith. We regard it as wholly improbable that this episode had any effect on the verdict.

Affirmed.

Fox, P. J., and Ashburn, J., concurred.